OLIVER C. WAGSTAFF and MARY WAGSTAFF, on Their Own Behalf and on Behalf of All Holders of Preferred Stock of Holly Sugar Corporation Similarly Situated, Appellants, *v.* HOLLY SUGAR CORPORATION, WILLIAM L. SWEET, JR., and GERTRUDE ROMM LEVY, Respondents.*

First Department, April 8, 1938.

* Affg. 165 Misc. 530.

*Arleigh Pelham* of counsel [*James L. Banks, Jr.*, with him on the brief; *Shiland, Hedges & Pelham* and *James L. Banks, Jr.*, attorneys], for the appellants.

*T. F. Davies Haines* of counsel [*Gerhard R. Gerhard* with him on the brief; *Appleton, Rice & Perrin*, attorneys for Holly Sugar Corporation]; [*Charles Garside* and *Henry C. Smith* with him on the brief; *Webster & Garside*, attorneys for William L. Sweet, Jr.]; and [*A. C. Patterson* with them on the brief; *Bleakley, Platt & Walker*, attorneys for Gertrude Romm Levy], for the respondents.

DORE, J. Plaintiffs, two preferred stockholders of the defendant corporation, suing on behalf of themselves and all other preferred stockholders similarly situated, appeal from a judgment in defendants' favor dismissing the complaint on the merits as against all defendants after a trial at Special Term. Plaintiffs sued the Holly Sugar Corporation (hereinafter referred to as " the corporation ") and the individual defendants who are joined as representatives of all common stockholders to enjoin payment of common stock dividends in excess of two dollars per share in any year, a rate to which plaintiffs claim common stock dividends are presently limited while preferred stock is outstanding.

The corporation was organized under the laws of the State of New York on April 4, 1916, with five shares of preferred, $100 par value, and five shares of common, without par value, and capital of $525. On April 5, 1916, on unanimous consent of all the stockholders, the preferred shares were increased to 53,000, the common to 58,000, and the capital to $5,590,000. By certificate of amendment filed April 6, 1922, the common was increased from 58,000 to 100,000 shares and the capital from $5,590,000 to $5,800,000. On November 8, 1935, the number of shares of preferred was reduced from 53,000 to 31,800, and the common stock increased from 100,000 to 500,000, the capital of the corporation remaining unchanged. The 500,000 shares of common were then distributed to the common stockholders on the basis of five of the new shares for each one of

the old.    Plaintiffs concede that this increase and split-up of common stock was consented to by the number of stockholders required by law, that is, a majority (Stock Corp. Law, § 37).    Defendants concede that less than ninety-five per cent in amount of the outstanding preferred stock voted for the amendments.

The corporation's charter contains the following provisions:

(1) " no dividend or dividends shall be paid upon the common stock of the corporation in any one calendar year in excess of Ten dollars ($10) per share, while any preferred stock is outstanding." (Art. 4, subd. [e].)

(2) " The corporation reserves the right to amend, alter, change or repeal any provision herein contained, in the manner now or hereafter prescribed by law, and all rights conferred on stockholders hereunder are granted subject to this provision, except that any amendment to Article Fourth hereof, in respect to the rights and privileges of holders of preferred stock, shall not be made without the consent of at least ninety-five per cent (95%) in amount of the preferred stock then outstanding."    (Art. 14.)

Plaintiffs contend that the above quoted clause of article fourth provides for an aggregate limitation on dividends payable upon the common stock as a class; that this limitation remains the same, after the 1935 five-to-one split-up, as it was before, namely, ten dollars per share in any one year on the common as it existed prior to the split-up, i. e., on 100,000 shares or a total aggregate dividend limitation of $1,000,000 in any one year; that this is the equivalent of two dollars per share on the 500,000 shares authorized after the split-up and that to pay more than this two dollars would be to alter the rights, privileges and preferences of the preferred stock; that under the terms of the charter this could not be done without the consent of ninety-five per cent of the preferred stockholders; that such consent concededly was not obtained; and that accordingly the dividend declared for 1937 in excess of two dollars per share and any attempted future dividends in excess of that amount should be enjoined.

Defendants contend that the limitation of dividends on the common stock to ten dollars per share per year is, as its terms indicate, a per share limitation and does not express or imply any aggregate limitation other than the limitation determined by the number of common shares outstanding at any time and that accordingly the dividend limitation on the present 500,000 shares of common stock is not two dollars but ten dollars per share per year as provited in article 4.    Defendants also contend that the preferred stockholders by prior action have so construed the limitation, have acquiesced in and ratified the right of the corporation to pay divi-

dends up to ten dollars on its outstanding common stock, and are barred by laches.

The Special Term sustained the defendants' interpretation of the contract and held proper the payment of a twenty-five-cent dividend on common in 1937 in addition to a two-dollar dividend already paid in that year, on the ground that, giving effect to all the provisions of the charter, there existed both the right to increase the number of shares and the right to declare dividends up to ten dollars a share on the number of common shares legally increased or authorized. The court, however, overruled defendants' affirmative defenses of practical construction, ratification and laches and to the findings and conclusions overruling these defenses defendants filed appropriate exceptions.

The above quoted relevant provisions of articles 4 and 14 of the original charter remain unchanged in all subsequent amendments to the charter and were contained in both the preferred and common stock certificates adopted and issued after amendments increasing the number of common shares in 1916, 1922 and 1935. All the preferred stock certificates now outstanding are in the form adopted after the 1935 amendment, except 1,889 shares which have not been exchanged. Immediately after the 1935 amendment, the preferred and common stock were listed on the New York Stock Exchange; and in the application for listing, copies of which were sent to all stockholders in December, 1935, the limitation upon common dividends was stated as ten dollars per share per year on the 500,000 shares of common authorized.

Certificates of stock based on the charter of the corporation as it existed at the time the certificates were issued constitute contracts between the corporation and its stockholders, the terms of which will be enforced by the courts and changes may not be made that will impair stockholders' vested property rights unless consent has been secured by the percentage required by statute or the charter. (See *Kent* v. *Quicksilver Mining Co.*, 78 N. Y. 159, 179, 180; *Parish* v. *New York Produce Exchange*, 169 id. 34.) As the amendment of November, 1935, was not consented to by ninety-five per cent of the preferred stockholders, that amendment could not alter or violate any right, privilege or preference secured to the preferred stock by the terms of the charter. Plaintiffs contend there has been such alteration. Defendants insist there has been no alteration or violation of any right secured the preferred stockholders under the terms of the charter.

The issue presented for our determination is whether the charter, as plaintiffs contend, gives the preferred stockholders, as part of their contractual rights, an *aggregate* limitation of ten dollars per

share on the common stock as a class; or, as defendants contend, is the limitation merely a *per share* limitation on the amount of common at any time lawfully issued and outstanding.

To determine the rights and privileges of the various classes of stock, the certificate or charter of the corporation must be read as a whole. The charter of this corporation is a long document covering eighteen printed pages of this record, written in the customary style of legal draftsmen, and among other things sets forth with meticulous care and explicit terms the rights and preferences and privileges of the preferred stock. Under the terms of the charter, preferred stockholders are entitled to receive cumulative dividends of seven per cent per annum payable out of the surplus profits of the corporation before any dividend may be paid or set apart for the common stock. Under article 4, subdivision (c), on the first of November and May of each year until all the preferred is redeemed, it is obligatory on the corporation to set apart and credit to a sinking fund out of the surplus profits of the corporation after all accumulated and defaulted dividends on the preferred have been paid or set apart, an amount equal to at least one-half of the net profits of the corporation arising from the earnings of the business for the preceding six months. By an amendment on April 4, 1928, to which ninety-five per cent of the preferred stock consented, it was provided that the sinking fund requirements in any one year might be satisfied by a credit to the sinking fund of $100,000. The charter also provides that the funds of the sinking fund shall be used and applied in the purchase of preferred stock which may be redeemed at a price on or before May 1, 1918, not to exceed $110 per share and all accumulated and unpaid dividends, and thereafter not to exceed $115 per share together with all accumulated, unpaid and accrued dividends thereon. The preferred stock so purchased or redeemed " shall never be reissued by the corporation." In addition to the amounts required to be set apart and credited to the sinking fund, it is further provided that, after payment of accumulated and defaulted dividends on preferred stock and after making provision for all dividends accruing thereon during any current year, the corporation may credit to the sinking fund out of surplus profits of the corporation " such other or further amounts as the board of directors may from time to time determine;" that any deficiency in the amount required to be set aside in any year shall be made good out of the surplus profits in subsequent years before any dividends shall be declared or paid upon the common stock; and that in no event shall any dividend whatever be declared or paid on the common until (1) the current quarterly dividend on the preferred, as well as all accumulated

and defaulted dividends thereon shall have been paid or set apart, and (2) all arrears, if any, in respect to any amounts thereinbefore required to be set apart and credited to the sinking fund shall have been made good.

After this detailed, exhaustive and explicit recital of the long category of rights, privileges and preferences of the preferred stock, only the salient parts of which have been here summarized, the charter then provides that, subject to all the foregoing provisions and not otherwise, such dividends as may be determined by the directors may be declared and paid on the common stock out of the remaining surplus profits, provided that no dividend thereon in any one year shall be in excess of ten dollars per share while any preferred is outstanding.

The charter also provides that the amount of preferred may not be increased without the consent of three-quarters of the issued and outstanding stock of each class; that in the event of insolvency or dissolution of the corporation or liquidation of assets, the preferred shall receive $100 per share and all accumulated unpaid and accrued dividends before any sum shall be paid to the common. Preferred and common are given equal voting rights, except in certain periods of default not here relevant, in which the common during the default loses its voting rights.

At the very end of the certificate it is provided by article 14, above quoted, that the corporation reserves the right to change any provision " in the manner now or hereafter prescribed by law," and that all rights conferred are subject to this provision except that any amendment to article 4 in respect to the rights and privileges of the preferred shall not be made without consent of ninety-five per cent of the preferred stock then outstanding.

It is to be noted that what is provided against in the exception is " any amendment to Article Fourth." At the meeting in November, 1935, there was no amendment to article 4 proposed or adopted. Its terms remained wholly unchanged and unamended. The amendment was to article 3 and related to the number of common shares authorized, increasing such number from 100,000 to 500,000 shares. We consider that none of the rights, privileges or preferences given the preferred stock under the terms of the charter were changed or violated by such amendment. All the elaborate provisions of the charter summarized above for the protection of the privileges and preferences of the preferred stockholders remained unchanged and unamended.

The right plaintiffs contend for is clearly not expressed in article 4 or elsewhere in the charter. The limitation expressed in article 4 is a per share limitation of ten dollars, not an aggregate limitation

as plaintiffs claim. It does not state that the ten dollars per share in any year shall be a limitation on the aggregate number of shares of common issued and outstanding at the time the contract was entered into. Plaintiffs insist that meaning is necessarily implied or the clause has no meaning. But if this were the intention of the parties it could easily have been expressed. In a charter drawn with such meticulous care and explicit provision for almost every conceivable state of facts relating to the rights of preferred stock, it is not likely that there was left to implication, as an additional vested right, the substantial privilege here claimed, namely, the right to maintain that there was an absolute aggregate dividend limitation on the common stock.

The charter provides that the preferred may not be increased without the consent of three-quarters of the stock issued and outstanding. There is no such limitation on the increase of common other than " in the manner now or hereafter prescribed by law." No claim is even made that the increase of 1935 was not legal and properly authorized by a majority of the stock issued and outstanding. The right to increase the number of shares of common was a right reserved by the charter and if the increase was in the manner provided by law the stockholder is deemed to have subjected himself thereto when he purchased his stock.

Before any dividends whatever were paid on common, all charter requirements respecting the sinking fund for the retirement of preferred had been fully complied with and all accrued and accumulated dividends on preferred from the time of the company's incorporation in 1916 to the date of the first common dividend in 1936 had been paid or set apart by the corporation.

It is not true, as plaintiffs urge, that the only safeguard for the protection of the dividend rights of the preferred is the claimed limitation on the aggregate amount of dividends on common in any year. All the clauses above referred to are expressly designed to safeguard the rights of the preferred, are ample for their protection, and have not been altered or amended. The directors, too, are under the duty to use the reasonable care that men of ordinary prudence would in the management of their own affairs and are bound to exercise their best judgment and good faith in the management of the business of the corporation and may not with impunity dissipate its assets by excessive dividends any more than by any other form of waste.

The number of common shares of this corporation has been increased three times without any amendment of the par share limitation on dividends. The increase from five shares to 58,000 shares in 1916 was unanimous, so it may be disregarded. But

the increase by the certificate filed in 1922 from 58,000 to 100,000 common shares received less than sixty-two per cent of the vote of the preferred stock. No preferred stockholder filed any complaint to any amendment until about two years after the increase in 1935. As a result of the increase by the certificate of 1922 a charter was approved in which the dividend limitation remained unchanged at ten dollars per share per year, although the increase of common from 58,000 to 100,000 necessarily increased the amount the corporation might in any one year distribute as dividends on common from $580,000 to $1,000,000. Plaintiffs do not ask that the aggregate dividend limitation be held to be $580,000. They consent to the validity of the increase in 1922 to 100,000 shares, and to an aggregate possible dividend of $1,000,000 in any year. They distinguish the increase of 1922 from that of 1935 by pointing out that the increase authorized in 1922 was issued for value, for new consideration running to the corporation, whereas the 1935 increase affected only a split-up without any consideration. The increased shares authorized in 1922 were issued as follows: 9,298 shares in April, 1922, to purchase the stock of Grand Junction Sugar Corporation and all of the interest in Western Sugar & Land Company Syndicate, and the remaining 32,702 shares in February, 1928, to purchase the net assets of Wyoming Sugar Corporation. While the issue was for value it is not shown what the cash value or consideration was but only what the company considered it to be.

To sustain their position that the 1922 amendment is not objectionable while the 1935 is, plaintiffs logically must claim that a second implied qualification be read into article 4 of the charter, namely, a qualification proportionately adjusting the dividend limitation to the amount of consideration received in case of any increase in common shares. But there is nothing in the charter which says the common may be increased for value and may not be increased without value, and judging from the manner in which the charter was written, if that were the intention, it would not only have been expressed but an explicit formula for determining value would have been provided no matter how complicated or involved the formula might be. It is not there. Plaintiffs' concession that the common may be increased for value is fatal to their contention. It necessarily involves the concession that the common may be increased and as there is no distinction in the charter between increase for value and increase without value, it follows that it may be increased as the charter provides on the consent of the number of shares required by law.

Plaintiffs are asking the court to rewrite the charter for them. They first ask the court to express by construction a clause that

concededly is not explicit; that the dividend limitation is an aggregate one on the number of shares of common issued and outstanding at the time the preferred is acquired. They now go further and ask us to write into that clause another provision, namely, that this limitation is not an absolute one but is subject to a single exception that the common may be increased if the increase is for value. They say they do not challenge the reasonableness of such construction. They may not do so, but the court must. If any such complicated provision was intended by the framers of this charter, it would have been expressed, and if the other clauses expressing the rights of the preferred are any criterion, it would have been expressed with meticulous exactitude and painful particularity of detail.

No authority in this State is cited for the precise point in issue. Defendants rely on *Bannatyne* v. *Direct Spanish Telegraph Co.* (L. R. 34 Ch. Div. 287) in which the corporation's charter provided for preferred shares of the par value of ten pounds entitled to a preferred dividend of ten per cent per annum. The charter also reserved the power to increase, diminish or alter the capital and after the issuance of the preferred shares the capital was reduced by changing the par value of each preferred share to five pounds. This was challenged by a preferred stockholder on the ground that such stockholders had a contractual right to a ten per cent dividend based on the original ten pounds par value. The Court of Appeal held that there was no breach of the preferred stockholders' contractual rights because " the true view of the bargain between the parties was this, that the preferential capital was created subject to the right of reduction which was expressly provided for in the articles of association." The court also said: " We must take into consideration this — that at the time this bargain was made there was this special provision in the articles, that the company might from time to time reduce its capital and also alter the amount and denomination of its shares. No doubt what has happened was not contemplated, but still those who made a bargain where the articles had that provision ought to know and take into consideration that, although they took the shares of £10 with a contract that there should be a dividend of 10 per cent, which so long as the shares were £10 would give them the £1 a share, there was in the clause in the articles a contemplation of its being necessary to reduce the capital. * * * The right is a right to a fixed preferential dividend of 10 per cent per annum. But on what? Obviously, it seems to me, on the amount of the shares, those shares being * * * subject to the power of reduction."

A similar ruling was made in a subsequent case, *Matter of Barrow Haematite Steel Co.* (L. R. 39 Ch. Div. 582), which differed from the *Bannatyne* case in the circumstance that at the time of the creation of the preferred the articles did not mention the power to reduce the capital.

Cases relied on by the plaintiffs we do not consider controlling. They deal with attempts to change stockholders' rights under charters that did not reserve the right to make the amendments complained of.

The ultimate basis of plaintiffs' contention is that the limitation in article 4 was provided so that the earnings of the company's good years should be employed to create a reserve for less favorable years if the seven per cent preferred stock is not to suffer; that an additional safeguard for the dividend and redemption rights of the preferred stock is the claimed limit upon the aggregate amount of dividends which could be paid on the common in any year; and that the history of the dividend record establishes the value of this protection since from 1916 to date there were five years in which no dividends were paid or preferred and two in which preferred shareholders received only part of the seven per cent requirement. But the history of the corporation does not support the fears of the preferred stockholders. All accrued dividends on the preferred have been paid. All requirements of sinking fund for retirement of preferred have been complied with. Over half of the maximum outstanding preferred has been retired out of earnings so that there are now outstanding less than 25,000 shares. The stated capital of the corporation which has been approximately $5,000,000 since 1916 is now more than half represented by common stock as indicated by the condensed balance sheet of March 31, 1937. This should be contrasted with the five per cent common stock representation immediately after the original increase in 1916. There is an earned surplus of over $5,000,000 in the company, more than twice the total par value of the outstanding preferred. Between March 31, 1917, and March 31, 1935, the preferred stockholders received dividends aggregating $4,362,896. During that time the common stockholders did not receive one cent in dividends on their shares although plaintiffs concede since the 1922 amendment, there was the authorization to pay up to $1,000,000 on common in any year. The respective interests of preferred and common stockholders in the equity of the corporation is now approximately: Preferred, twenty-three per cent; common, seventy-seven per cent, as contrasted with: Preferred, ninety-five per cent; common, five per cent, in 1916. While we are concerned with the legal interpretation of the contract, all of the above is relevant on plain-

tiffs' contention that the equities support their claim. And it must be remembered that plaintiffs are invoking the equity powers of the court, for they seek a permanent injunction against any dividend in excess of two dollars per share per year on the common stock as presently authorized and outstanding.

The learned court at Special Term held that the doctrine of practical construction was not applicable to the facts of this case and also overruled the defenses of acquiescence and ratification. We consider that in so doing the court erred.

On October 18, 1935, the notice of the special meeting of the stockholders was sent to all stockholders and stated that the meeting would be called on November 8, 1935, for action on resolutions recommended by the directors (1) to increase the authorized common from 100,000 no par value to 500,000 no par value and provide for the issuance of this stock to the common stockholders on the basis of five new shares in exchange for each old share; and (2) to reduce the authorized preferred from 53,000 to 31,800, the amount then outstanding. In a letter transmitted with the notice of meeting the president of the corporation informed the stockholders that of the issue of 53,000 preferred authorized in 1922, 21,200 shares had been retired, leaving 31,800 outstanding, of which 6,800 were in the company's treasury; that the earnings of the company had been reinvested in its business, preferred stock and bonds had been retired and the equity of the common stock had been increased; that the proposed increase in the number of common shares was to recognize this increase in equity; and that the relative number of shares to be outstanding would after the increase be more in proportion to the production, volume of business and value of the corporation's net assets as compared with other companies in the same business. They were also told that application would be made to the New York Stock Exchange for listing the new common stock and the present preferred stock.

At the special meeting called in pursuance to this notice resolutions were adopted by a majority of the corporation's stockholders entitled to vote (sixty-four per cent of preferred; seventy-nine per cent of common) reducing the preferred from 53,000 to 31,800, increasing the common from 100,000 to 500,000 shares, and providing that no change in the designations, preferences, privileges and voting powers or restrictions or qualifications thereof be effected by the change.

In November, 1935, the application to list the stock on the New York Stock Exchange was mailed to all preferred stockholders and contained a statement that the authorized number of shares of common stock is 500,000 and the dividend limitation is ten dollars

per share per year. After the issuance of the 500,000 shares there were numerous transfers of these shares made in reliance on the resolution adopted at the meeting of November 8, 1935, and there have been substantial dealings in the common stock of the corporation on the New York Stock Exchange. Numerous persons have acquired shares of such common stock for value and without notice of any restrictions on their right to receive dividends other than those appearing upon the certificates of stock received by them, which is expressly stated to be ten dollars per share, and the number of shares authorized stated as 500,000. Since 1935, 1,540 new stockholders have acquired 145,816 shares of common stock. Since 1922 the preferred stockholders have not contested the right of the corporation to pay dividends on the increased number of common shares authorized, though the increase was not made by a ninety-five per cent vote of preferred. No protest, claim or objection was made by any holder of preferred stock to the proceedings taken in November and December, 1935, until this action was brought in June, 1937. We consider that this course of conduct, especially in view of the fact that the rights of third persons have intervened while the preferred stockholders were quiescent, should be deemed a practical construction of the contract and an acquiescence and ratification by the preferred stockholders of the corporation's right to pay dividends up to ten dollars per share on the number of shares of common at any time issued and outstanding.

In answer to this, plaintiffs contend that the amendment of April 4, 1928, under the terms of which it was provided " that the sinking fund requirements in any one year may be satisfied by a credit thereto of $100,000," was consented to by more than ninety-five per cent of the preferred stock and that, therefore, subsequent to the increase of the common to 100,000 shares the language of the dividend limitation was expressly assented to by more than the required percentage of preferred stockholders. Plaintiffs allege that the 1928 certificate contained a restatement of the privileges of the shares of each class of stock, including the dividend limitation of ten dollars per share, and was approved by the holders of over ninety-five per cent of preferred outstanding. While it is true that ninety-five per cent concurred in the amendment reducing the sinking fund requirements, the record does not bear out plaintiffs' contention as to the certificate of reclassification. That certificate was not voted for by ninety-five per cent. The only thing the ninety-five per cent consented to at the meeting of April 4, 1928, was the reduction of the sinking fund requirement. Thereafter the certificate was executed on behalf of the corporation by its officers and filed. Ninety-five per cent of the stockholders have never voted for the

increase to 100,000 shares; but sixty-one per cent of the preferred voted for that increase in 1922. Accordingly this contention of the plaintiffs should be overruled and it should be held that the preferred stockholders have ratified and acquiesced in the principle that they now object to and by their conduct have given to the charter the practical construction claimed by defendants.

Plaintiffs are invoking the equity powers of the court, and a stockholder who asks a court of equity for relief must act promptly after acquiring knowledge of the facts. (14 C. J. 879, § 1338; *Pollitz v. Wabash R. R. Co.*, 207 N. Y. 113.)

In the light of the charter provisions, the conduct of the corporation and the stockholders, we conclude that the learned Special Term did not err in dismissing the complaint, though we find as additional grounds for such dismissal the practical construction of the parties and ratification and acquiescence by the preferred stockholders.

From all of the above it follows that the judgment so far as appealed from should be affirmed, with costs.

MARTIN, P. J., COHN and CALLAHAN, JJ., concur; TOWNLEY, J., dissents.

TOWNLEY, J. (dissenting). Article 4, subdivision e, of the charter was inserted for the protection of holders of preferred stock. The limitation of dividends upon the common stock to ten dollars a share per year was to assure the accumulation of a surplus as a reserve fund for the greater security of the preferred stock. The rights established by these provisions cannot be destroyed by the simple device of dividing existing shares into fractions and paying the maximum of ten dollars on each fraction. To call these fractions full shares is to substitute form for substance and deceive by the mere use of words. As between preferred and common stockholders, the charter provisions permitting an increase in common stock must be interpreted to permit the issuance of additional stock for value only. In that case the value received becomes part of the capital structure and is the basis for the additional obligation represented by the new stock.

Judgment, so far as appealed from, affirmed, with costs.