**AKCESS PACIFIC GROUP LLC, Plaintiff,**

v.

**WINSTAR COMMUNICATIONS INC., et al., Defendants.**

**No. 98 Civ. 8273(LAK).**

United States District Court, S.D. New York.

Oct. 20, 1999.

John K. Crossman, Lisa M. Campisi, Elizabeth M. Miller, Zevnik, Horton, Guibord, McGovern, Palmer & Fognani, L.L.P., New York City, for plaintiff.

John E. Jenkins, Michael O. Adelman, Shanley & Fisher, P.C., New York City, for CellularVision, defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiff Akcess Pacific Group LLC ("Akcess") was thwarted in its attempt to take over defendant CellularVision U.S.A., Inc., now known as SpeedUs.com, Inc. ("CVUSA"). It claims that CVUSA improperly refused to convert preferred shares of CVUSA into common stock at the behest of the holder, Marshall Capital Management, Inc. ("MCM"), which had contracted to sell to Akcess common shares issued upon conversion, and also that it improperly sold an important asset to the Winstar defendants. Defendants CVUSA, CellularVision of N.Y.L.P. and Shant Hovnanian now move for summary judgment dismissing the complaint.[1]

### Facts

The facts material to this motion are few, and they all are undisputed.

#### The Convertible Preferred Stock

In April 1998, CVUSA, a Delaware corporation, filed a certificate of designation of Series A Convertible Preferred Stock

---

1. Plaintiff voluntarily discontinued the action as against Winstar Communications Inc. and Winstar Wireless Fiber Corp.

This motion was directed to the amended and supplemental complaint. While it was pending, the Court noted the inadequacy of the jurisdictional allegations of that pleading and permitted their cure by the filing of a second amended and supplemental complaint. As the changes are not material to this motion, the motion is treated as directed to the second amended and supplemental complaint.

pursuant to Section 151 of the Delaware General Corporation Law.[2] The preferred was convertible into common subject, insofar as is relevant here, to one important restriction. Paragraph 5 of the certificate provides in relevant part:

"In no event shall a Holder be permitted to convert any Preferred Shares in excess of the number of such shares, upon the Conversion of which:

"(a) the number of Conversion Shares to be issued pursuant to such Conversion, when added to the number of shares of Common Stock issued pursuant to all prior Conversions of Preferred Shares ... would exceed 19.99% of the number of outstanding shares of Common Stock ...; and

"(b)(x) the number of shares of Common Stock beneficially owned by such Holder (other than shares of Common Stock issuable upon conversion of such Preferred Shares or which would otherwise be deemed beneficially owned except for being subject to a limitation on conversion or exercise analogous to the limitation contained in this subparagraph (b)) *plus* (y) the number of shares of Common Stock issuable upon the Conversion of such Preferred Shares, would be equal to or exceed (z) 4.99% of the number of shares of Common Stock then issued and outstanding. As used herein, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended, and the rules thereunder. To the extent that the limitation contained in this paragraph 5(b) applies, the determination of whether Preferred Shares are convertible (in relation to other securities owned by a Holder) and of which Preferred Shares are convertible shall be in the sole discretion of such Holder, and the submission of Preferred Shares for Conversion shall be deemed to be such Holder's determination that such Preferred Shares are convertible pursuant to the terms hereof, and the Corporation shall have no obligation whatsoever to verify or confirm the accuracy of such determination."

In other words, a holder of the preferred could not convert to the extent that the holder, as a result of conversion, would own beneficially, within the meaning of Section 13(d) of the Exchange Act[3] and the rules and regulations thereunder, more than 4.99 percent of CVUSA's common stock

Immediately after the filing of the certificate of designation, CVUSA sold to MCM $3.5 million worth of convertible preferred shares.

### The Winstar Transaction

In July 1998, CVUSA entered into a contract to assign to Winstar 850 MHz of the spectrum covered by CVUSA's LMDS license for $32.5 million. The consummation of the agreement required approval by CVUSA and the Federal Communications Commission.[4]

### Akcess Enters the Scene

By the fall of 1998, Akcess decided to seek to acquire control of CVUSA.[5] On October 13, 1998, it entered into an agreement with MCM pursuant to which Akcess agreed to purchase, and MCM agreed to sell to Akcess, all CVUSA common shares into which MCM's CVUSA preferred shares were convertible.[6] In addition, MCM agreed to use its best efforts to convert its preferred as promptly as practicable, although Akcess acknowledged that MCM's ability to do so was limited by

---

**2.** 8 Del.C. § 151 (1998).

**3.** 15 U.S.C. § 78m (1999).

**4.** The agreement ultimately was consummated on November 24, 1998. Joint Pre-trial Order ("PTO"), § III, ¶ 25. (All subsequent references to the pretrial order are to Section III unless otherwise indicated.)

**5.** Jenkins Aff. Ex. I, at 6; *see id.* Ex. J, at 59–60.

**6.** Livingston Aff. Ex. 2, ¶ 1.

the terms of the certificate of designation.[7] Moreover, MCM covenanted that it would pursue any and all remedies available to it against CVUSA, using counsel reasonably acceptable to Akcess, in the event that CVUSA failed to honor MCM's conversion demands and that it would not settle any such claim against CVUSA absent Akcess' consent.[8] MCM, however, was obliged to spend more than $25,000 in doing so only if Akcess agreed to reimburse it for the excess.[9]

A few days later, Akcess contracted to purchase from Newstart Factors, Inc. ("Newstart") a note of CVUSA which was convertible into more than 3.7 million CVUSA common shares.[10]

It is undisputed that conversion of the CVUSA note purchased from Newstart and the conversion and transfer to Akcess of all of the common issuable upon conversion of all of the CVUSA preferred owned by MCM would have given Akcess voting control of CVUSA. Although the point is not material to this motion, Akcess' strategy evidently was to structure its agreement with MCM in such a way that MCM never would be the beneficial owner of more than 4.99 percent of CVUSA's common stock—MCM would convert preferred sufficient to result in issuance of common stock equal to 4.99 percent of the number of shares outstanding, transfer the common to Akcess, and then repeat the process until it converted all its common shares.[11] It apparently believed that this would succeed because Akcess' ownership of CVUSA common stock would not be attributed to MCM under Section 13(d) of the Exchange Act and thus not interfere with MCM's conversion rights.[12]

*The Attempt to Convert of the MCM–Owned Preferred*

On or about October 23, 1998, MCM delivered to CVUSA a notice to convert sufficient preferred shares to result in issuance of common stock amounting to 4.99 percent of the total common stock issued and outstanding.[13] At about the same time, Akcess filed a Schedule 13D which revealed that it was the beneficial owner of more than 17 percent of the outstanding shares of CVUSA by virtue of its acquisition of the Newstart note.[14] In letters dated November 2 and 3, 1998, CVUSA declined to convert the shares. It took the position that conversion was precluded by paragraph 5(b) of the certificate of designation because MCM and Akcess were members of a group within the meaning of Section 13(d) of the Exchange Act and that MCM therefore was deemed to be the beneficial owner of more than 4.99 percent of CVUSA's common stock.[15] Following its rebuff of the conversion attempt, CVUSA redeemed MCM's preferred shares for over $4.6 million,[16] and MCM thus made a profit of over $1.1 million on an investment that it had held for about five weeks.

*The Complaint*

The second amended and supplemental complaint contains seven claims for relief. Counts 1 through 3 attack the sale of the 850 MHz license to Winstar as improperly authorized and a fraudulent conveyance and seeks to impose a constructive trust upon the license or the proceeds of its sale. Counts 4 through 6 all rest on Akcess' claim that CVUSA's refusal to convert MCM's preferred shares was tortious as to Akcess. Finally, Count 7 alleges that CVUSA's refusal to convert MCM's shares

---

7. *Id.* ¶ 3, 151 N.Y.S.2d 1, 134 N.E.2d 97.

8. *Id.* ¶ 6, 151 N.Y.S.2d 1, 134 N.E.2d 97.

9. *Id.*

10. Jenkins Aff. Ex. I, at 7–8.

11. *See* Jenkins Aff. Ex. J, at 62–63.

12. *Cf.* Livingston Aff. Ex. 2, ¶ 7.

13. Hovnanian Aff. ¶ 7.

14. *Id.* ¶ 9, 151 N.Y.S.2d 1, 134 N.E.2d 97; Jenkins Aff. Ex. I.

15. Jenkins Aff. Ex. D, E.

16. PTO ¶ 26.

constituted a breach of CVUSA's contract with MCM and that Akcess is entitled to enforce the contract as a third party beneficiary. In the course of prior proceedings, plaintiff has abandoned Counts 1, 5 and 6.[17]

## Discussion

### The Claims Based on the Sale to Winstar

Counts 2 and 3 allege that the sale of the 850 MHz license to Winstar was a fraudulent conveyance because it was made a time when CVUSA was insolvent and seeks to impose a constructive trust on the license or sale of the proceeds. The evidence before the Court on this motion, however, demonstrates that CVUSA was solvent.[18] Akcess no longer contends otherwise and does not oppose dismissal of these claim. Counts 2 and 3 therefore will be dismissed.

### The Claim of Interference With the MCM–Akcess Contract

■ As plaintiff points out,[19] the elements of a claim for tortiously inducing breach of contract, the theory of Count 4, were set forth by the New York Court of Appeals in *Israel v. Wood Dolson Co.*[20] In order to succeed on such a claim, a plaintiff is obliged to prove:

"(1) the existence of a valid contract between [the party allegedly in breach] and himself; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the

breach of that contract . . ., and (4) damages."[21]

Thus, if there is no breach of contract, no one can be liable for inducing breach.[22]

■ That is the rock on which Akcess' inducing breach claim founders. MCM's obligations, insofar as are relevant here, were to use its best efforts to convert its preferred into common and then to sell the common thus obtained to Akcess. MCM sent the requisite notice to convert. CVUSA rejected it. There is no suggestion that MCM breached its contract with Akcess, much less that CVUSA induced it to do so.

Akcess seeks to avoid this rather obvious point by subtly paraphrasing the *Wood Dolson* case to suggest that it need prove only that "[t]he Akcess–Marshall contract was not carried out as a result of defendants' refusal to convert."[23] But it is wrong in two respects. First, that is not what the Court of Appeals said in *Wood Dolson*—it spoke of a required breach. In any case, there is no evidence whatever that the Akcess–Marshall contract "was not carried out." Marshall, according to plaintiff's own allegations, did precisely what it contracted to do—it used its best efforts to convert. The fact that those efforts did not result in the issuance of common stock to Marshall and its subsequent sale to Akcess was not the product of any breach of duty by Marshall, which "carried out" its obligations to Akcess.

---

**17.** Defendants moved for judgment on the pleadings dismissing the complaint and argued that all counts were insufficient. Plaintiff's papers in opposition did not defend the sufficiency of Counts 1, 5 and 6. Defendants asserted that the claims had been abandoned. Reply memorandum in further support of defendants' motion to dismiss ("Reply Mem.") at 1. Although the Court denied that motion on the ground that the filing of the present motion mooted it, all parties have proceeded on the assumption that Counts 1, 5 and 6 are out of the case. In view of plaintiff's failure to resist summary judgment dismissing these aspects of its complaint, the Court deems them abandoned.

**18.** Hovnanian Aff. ¶ 13.

**19.** Akcess' memorandum in opposition to defendants' motion for summary judgment ("Pl. Mem.") at 5.

**20.** 1 N.Y.2d 116, 151 N.Y.S.2d 1, 134 N.E.2d 97 (1956).

**21.** *Id.* at 120, 151 N.Y.S.2d at 5, 134 N.E.2d 97.

**22.** *See* Pl.Mem. at 5–6.

**23.** *Id.* at 6.

As plaintiff cannot establish an essential element of its claim—breach of contract by MCM—Count 4 must be dismissed.

*The Third Party Beneficiary Claim*

Count 7 seeks recovery on the theory that the certificate of designation of the convertible preferred was a contract between CVUSA and its shareholder, MCM, that its refusal to convert breached that contract, and that Akcess is entitled to sue for that breach as a third party beneficiary. Certainly no one denies that the certificate of designation created contractual rights and duties as between CVUSA and MCM.[24] The question is whether Akcess is entitled to enforce them.

■ Under New York law,[25] only an intended beneficiary of a contract may assert a claim as a third-party beneficiary.[26] A third party is an intended beneficiary where either (1) "no one other than the third party can recover if the promisor breaches the contract"[27] or (2) "the language of the contract otherwise clearly evidences an intent to permit enforcement by the third party."[28]

■ The first prong of this standard patently is not satisfied here. The contract inherent in the certificate of designation was between CVUSA and holders of the convertible preferred shares. MCM obviously had the power to enforce its terms. Indeed, Akcess so admitted by obtaining MCM's commitment, in the MCM–Akcess agreement, to use its best efforts to convert the preferred and to pursue all available remedies against CVUSA, including litigation employing counsel reasonably satisfactory to Akcess, if CVUSA rejected its demand to convert.

Nor does the language of the certificate of designation clearly evidence an intention to permit enforcement by a third party such as Akcess. Such an intention, under New York law, "must be shown on the face of the agreement."[29] There is simply nothing in the certificate to support the conclusion that CVUSA and, to whatever extent its intention might be relevant, MCM intended the certificate to be enforceable by anyone other than holders of the convertible preferred. To the contrary, the only portion of the certificate that even arguably contemplated enforcement by a third party is paragraph 9(a), which provided only that a transferee of preferred shares would be deemed a holder thereof from and after the date of the transfer. The certificate is silent as to the

**24.** *See, e.g., Waggoner v. Laster,* 581 A.2d 1127, 1134 (Del.Sup.1990); *Wagstaff v. Holly Sugar Corp.,* 253 App.Div. 616, 620, 3 N.Y.S.2d 552, 556 (1st Dept.), *aff'd,* 279 N.Y. 625, 17 N.E.2d 681 (1938).

**25.** The parties have briefed this motion on the assumption that New York law governs. In such circumstances, the Court applies New York law in the absence of any strong public policy to the contrary irrespective of whether the law of another state would govern if the choice of law issue were litigated. *See Cargill, Inc. v. Charles Kowsky Resources, Inc.,* 949 F.2d 51, 55 (2d Cir.1991); *Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 52–53 (2d Cir.1984); *Allstate Ins. Co. v. Administratia Asigurarilor De Stat,* 948 F.Supp. 285, 297 (S.D.N.Y.1996).

**26.** *See Mortise v. United States,* 102 F.3d 693, 697 (2d Cir.1996); *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.,* 66 N.Y.2d 38, 44–45, 495 N.Y.S.2d 1, 4–5, 485 N.E.2d 208 (1985).

**27.** *Fourth Ocean,* 66 N.Y.2d at 45, 495 N.Y.S.2d at 5, 485 N.E.2d 208 (citing *Seaver v. Ransom,* 224 N.Y. 233, 239, 120 N.E. 639 (1918); *Matter of International Ry. Co. v. Rann,* 224 N.Y. 83, 88, 120 N.E. 153 (1918)).

**28.** *Id.* (citing *McClare v. Massachusetts Bonding & Ins. Co.,* 266 N.Y. 371, 379, 195 N.E. 15 (1935); *Rigney v. New York Cent. & Hudson Riv. R.R. Co.,* 217 N.Y. 31, 38, 111 N.E. 226 (1916)). The example given in *Fourth Ocean* is a contract which, despite there being no duty between the promisee and the beneficiary, fixes the rate or price at which the beneficiary can obtain services or goods. *Id.* (citing *Pond v. New Rochelle Water Co.,* 183 N.Y. 330, 336, 76 N.E. 211 (1906); *Little v. Banks,* 85 N.Y. 258 (1881)).

**29.** *Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660, 663 (2d Cir.1996) (quoting *In re Gulf Oil/Cities Tender Offer Litig.,* 725 F.Supp. 712, 733 (S.D.N.Y.1989)).

rights of contract vendees of shares of common stock that would be issued and sold upon conversion of the preferred.

Akcess nevertheless argues that a letter agreement, dated October 12, 1998, between CVUSA and MCM[30] (the "Letter") demonstrates that the certificate of designation was intended to be enforceable by Akcess or another in its position.[31] The salient terms of the Letter for present purposes are these:

1. MCM agreed not to convert any of its preferred as long as certain conditions, relating principally although not exclusively to the Winstar transaction, remained satisfied.

2. If any of the conditions ceased to be satisfied, MCM would regain the right to convert and CVUSA would "effect all conversions ... thereafter strictly in accordance with the terms of the Certificate ..."

3. The conversion price was adjusted to MCM's benefit, resulting in an increase in the number of common shares into which its preferred stock was convertible.

The Letter adds nothing to Akcess' position, even assuming, as Akcess contends, that CVUSA knew when it entered into the Letter that MCM was negotiating to sell its stock. The first prong of the New York standard for third party enforcement of contracts remains unsatisfied because MCM obviously could enforce its own rights under the Letter without the need for any non-party. And the second is un-

satisfied because knowledge that MCM might sell its stock is not equivalent to, or even suggestive of, an intention on the part of CVUSA or MCM to permit enforcement of MCM's rights by another.[32]

Accordingly, the moving defendants are entitled to dismissal of Count 7. In view of the basis for this conclusion, the Court need express no opinion with respect to whether CVUSA's refusal to convert MCM's preferred was consistent with the certificate of designation and the Letter.

### Conclusion

For the foregoing reasons, the motion of defendants CellularVision of N.Y., L.P., CellularVision U.S.A., Inc. and Shant Hovnanian for summary judgment dismissing the second amended and supplemental complaint [31–1] is granted. Plaintiff's motion *in limine* [35–1] is rendered moot by the dismissal of the complaint and therefore is denied as well. Although the moving defendants originally filed a counterclaim in this action,[33] the joint pretrial order contained no claims and sought no relief against plaintiff.[34] The counterclaim therefore has been abandoned. The Clerk therefore is directed to enter final judgment dismissing the action in all respects.

SO ORDERED.

30. Livingston Aff. Ex. 4.

31. Pl. Mem. at 12–13.

32. *Cf. Katzeff v. Cohn*, 139 M.2d 1076, 1077, 529 N.Y.S.2d 436, 437–38 (Sup.Ct. Nassau Co.1988).

33. Docket Item 17.

34. PTO §§ IV.B, V, XI.