NATIONAL WESTMINSTER
BANK PLC, Plaintiff,

v.

GRANT PRIDECO, INC.,
et al., Defendants.

No. 02 Civ. 9926(LAK).

United States District Court,
S.D. New York.

April 29, 2003.

Benjamin H. Green, Karlene J. Rogers, Emmet, Martin & Martin LLP, for Plaintiff.

Gerald J. Fields, Patrick J. Rohan, Paul, Hastings, Janofsky & Walker LLP, for Defendant Active Media Services, Inc.

Jeffrey A. Mitchell, Gary M. Fellner, Fischbein●Badillo●Wagner●Harding, for

Defendants Grant Prideco, Inc. and Weatherford International, Inc.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiff National Westminster Bank, Plc ("NatWest") brings this action to recover funds advanced to Grant Prideco, Inc. ("GPI"), a manufacturer of oilfield tubular steel products, as part of a trade barter agreement. Defendants GPI, Weatherford International, Inc. ("Weatherford"), GPI's former parent company, and Active Media Services, Inc. ("Active") move, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the complaint in its entirety. In the alternative, defendants GPI and Weatherford (the "GPI Defendants") move to stay the action pending joinder of Reliance Insurance Company of Illinois ("Reliance"), or its successor, as a necessary party pursuant to Fed.R.Civ.P. 12(b)(7) and 19.

*Facts*

### A. *The Agreements*

The specific terms of the trade barter arrangement were contained in four agreements, three of which are dated March 17, 1998. Each agreement is described in turn.

#### 1. *Trade Finance Agreement*

Under the Trade Finance Agreement, dated March 17, 1998, defendant Active agreed to issue GPI $4.65 million in trade credits in return for: (1) a $750,000 cash payment in connection with the sale of certain real property owned by GPI, and (2) a $1,243,542.33 cash payment from a $3,443,542.33 cash advance received by GPI from NatWest pursuant to a Trade

Credit Cash Advance Agreement.[1]

The Trade Finance Agreement obligated GPI to purchase certain goods and services through Active and Active's customers for a period of three years, provided the goods and services presented by Active were of equivalent quality and competitively priced with goods and services available to GPI from other sources.[2] As part of the Trade Finance Agreement, GPI agreed to comply with the terms and conditions of a Countertrade Consumption Procedure, pursuant to which GPI agreed to use its reasonable efforts to, *inter alia*, introduce Active to its qualified suppliers of goods and services and arrange and participate in meetings between Active and such suppliers to encourage the suppliers to accept partial payment in the form of trade credits.[3] Each time GPI purchased goods and services through Active, a percentage of the amount invoiced was to be designated by Active as the trade credit reduction amount.[4] GPI was to pay that amount directly to NatWest until NatWest was repaid $4.65 million.[5]

## 2. Trade Credit Cash Advance Agreement

Pursuant to the Trade Credit Cash Advance Agreement ("Cash Advance Agreement") among NatWest, GPI and Weatherford as successor to EVI, also dated March 17, 1998, NatWest agreed to advance GPI $3,443,542.33 in consideration for which NatWest was entitled to receive cash payments from GPI generated by GPI's exhaustion of its trade credits.[6]

In the event GPI or Weatherford as successor to EVI failed in any material respect to comply with the Cash Advance Agreement or the Trade Credit Payment Agreement (described below), or GPI materially breached its obligations under the Trade Finance Agreement, then, upon the occurrence and continuance of such default, NatWest was entitled to accelerate that part of the $4.65 million dollars outstanding and to receive payment of that amount from GPI or Weatherford.[7] Furthermore, the GPI Defendants agreed to indemnify and hold plaintiff harmless from and against any and all damages, losses, claims and costs, including attorneys fees suffered by NatWest in the event of an event of default and to pay to NatWest interest on that part of the $4.65 million outstanding.[8]

## 3. Trade Credit Payment Agreement

Pursuant to the Trade Credit Payment Agreement, dated March 17, 1998, GPI and Active agreed, *inter alia*, that GPI would pay all amounts designated by Active as trade credit amounts directly to NatWest.[9]

## 4. Insurance Policy

Pursuant to the Cash Advance and Trade Finance Agreements, Active purchased a trade credit insurance policy (the "Policy") from Reliance.[10] The Policy pro-

---

1. Cpt. Ex. A §§ 1.1, 2.1.

2. Cpt. ¶¶ 14–15, 17–19.

3. Cpt. Ex. A § 4.1 & Sch. B.

4. Cpt. Ex. A § 4.2.

5. Cpt. ¶ 14, Ex. A. §§ 4.3(i)-(ii).

6. Cpt. ¶ 21, Ex. B ¶ A.

7. Cpt. Ex. B ¶ 8.

8. *Id.*

9. Cpt. ¶ 26, Ex. C ¶ 1.

10. Cpt. ¶ 27, Ex. D.

The policy subsequently was transferred to Nutmeg Insurance Company, a subsidiary of the Hartford Insurance Company. Cpt. ¶ 31.

vided coverage to indemnify NatWest as "loss payee" for any loss it incurred in the event GPI, the "insured," despite compliance with its agreements, was unable to purchase sufficient goods and services to generate the requisite amount of trade credits to retire the amount due NatWest by the end of the term.[11] The Policy excludes coverage for any loss due to GPI's failure to perform any material obligations set forth in the Countertrade Consumption Procedure, annexed to the Trade Finance Agreement.[12] The Policy provides further that a claim under the Policy is to be supported by certification from both Active and GPI that GPI fulfilled its obligations under the Countertrade Consumption Procedure and a letter from an independent accounting firm confirming GPI's compliance.[13] Pursuant to the Cash Advance Agreement, GPI covenanted that it would comply with its obligations under the Policy and provide the documentation necessary to perfect a claim under the Policy.[14]

## B. *GPI Fails to Use Any Trade Credits During Contract Term*

During the entire three year term of the Cash Advance, Trade Finance and Trade Credit Payment Agreements, *i.e.,* between March 30, 1998 and March 31, 2001, there was no activity under the trade barter arrangement.[15] GPI made no purchases through Active and/or Active's customers, and NatWest received no payment to re-duce the $4.65 million due under the arrangement.

On May 29, 2001, NatWest requested that GPI either perfect its insurance claim or arrange for immediate payment of all amounts owed under the Cash Advance Agreement.[16] GPI informed NatWest that it would prepare materials to perfect the insurance claim, but it never did.[17] Active, however, did provide written notification to Reliance certifying that GPI failed to fulfill any of its obligations under the Trade Finance and Cash Advance Agreements.[18]

## C. *The Complaint*

NatWest filed the complaint on December 12, 2002. It contains four claims for relief:

(1) The first is against GPI and Weatherford and alleges breach of the Cash Advance Agreement by virtue of the defendants' failure to comply with the obligations of the Trade Finance Agreement and Countertrade Consumption Procedure, failure to purchase goods and services from and/or through Active, failure to cooperate and work with Active to reach levels of purchases sufficient to repay NatWest, failure to provide the documentation necessary to support a claim under the Policy and failure to indemnify NatWest.[19]

(2) The second claim alleges breach of the Trade Finance Agreement by GPI and Active. NatWest alleges that it

---

11. Cpt. Ex. D § I.

12. Cpt. ¶ 27, Ex. D § III.C.

13. Cpt. Ex. D § VI.

14. Cpt. ¶¶ 29–30, Ex. B ¶ 7(j).

15. Mem. in Opposition to Active's Motion to Dismiss ("Mem.Opp.Active") 6.

16. Cpt. ¶ 32.

17. *Id.* GPI states in its Reply Memorandum that it is working with accountants in an effort to prepare an attestation in the event one becomes necessary. GPI and Weatherford Reply Mem. 10.

18. Cpt. ¶ 33.

19. *Id.* ¶¶ 34–39.

may recover as an intended third-party beneficiary.[20]

(3) The third is a claim against GPI, Weatherford and Active for breach of the covenant of good faith and fair dealing.[21]

(4) The fourth is a claim against GPI, Weatherford and Active for unjust enrichment.[22]

## Discussion

### A. Motion to Dismiss Standard

In resolving the motions to dismiss, the Court accepts as true the factual allegations set forth in the complaint and draws all reasonable inferences in plaintiff's favor.[23] "[D]ismissal is appropriate if the plaintiff can prove no set of facts that would entitle him to relief."[24] The issue is not whether the plaintiff ultimately will prevail but whether the plaintiff is entitled to offer evidence to support its claims.[25] Although Rule 12(b) motions are made solely upon the pleadings,[26] the Court considers also the four agreements attached to the complaint.[27]

### B. First and Second Claims for Relief against GPI Defendants

The GPI Defendants argue that NatWest's claim that Active breached its obligations under the Trade Finance Agreement precludes any possibility of liability on the part of the GPI Defendants for breach of the Cash Advance Agreement (count one) or the Trade Finance Agreement (count two).[28] They allege further that only a continuous breach is actionable under the Cash Advance Agreement and that the complaint fails to allege a continuous breach. They are mistaken.

#### 1. Allegations against Active Do Not Necessarily Absolve GPI Defendants

The first claim for relief alleges that the GPI Defendants breached the Cash Advance Agreement by, *inter alia,* violating the terms of that agreement, the Trade Finance Agreement, and the Countertrade Consumption Procedure, failing to purchase goods and services from and/or through Active, failing to cooperate and work with Active to reach levels of purchases sufficient to repay plaintiff, failing to provide the documentation necessary to

20. *Id.* ¶¶ 40–42.

21. *Id.* ¶¶ 43–45.

22. *Id.* ¶¶ 46–51.

23. *Levy v. Southbrook Int'l Invs., Ltd.,* 263 F.3d 10, 14 (2d Cir.2001), *cert. denied,* 535 U.S. 1054, 122 S.Ct. 1911, 152 L.Ed.2d 821 (2002) (citing *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994)).

24. *Id.* (citing *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998)); *accord Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir.2000).

25. *See, e.g., Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995).

26. FED. R. CIV. P. 12(b).

27. *See, e.g., Dangler v. New York City Off Track Betting Corp.,* 193 F.3d 130, 138 (2d Cir.1999)

("In ruling on [a motion to dismiss], the court is to look only to the allegations of the complaint and any documents attached to or incorporated by reference in the complaint."); *Leonard F. v. Israel Disc. Bank of New York,* 199 F.3d 99, 107 (2d Cir.1999) (quoting *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991)); *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir.1991).

28. GPI and Weatherford Mem. 10 (citing *Alesayi Beverage Corp. v. Canada Dry Corp.,* 947 F.Supp. 658, 667 (S.D.N.Y.1996), *aff'd,* 122 F.3d 1055, 1997 WL 539768 (2d Cir.1997) ("When a party materially breaches, it has failed to substantially perform the contract and the other party is discharged from performing its obligations.") (applying New York law)).

support a claim under the Policy and failing to indemnify NatWest.[29] The GPI Defendants argue that the complaint establishes that Active materially breached the Trade Finance Agreement, thus excusing GPI's performance.[30]

Even assuming that Active did materially breach the Trade Finance Agreement, NatWest has alleged facts sufficient to show that the GPI Defendants may have defaulted under the Cash Advance Agreement by other means, independent of the Trade Finance Agreement. For example, the complaint alleges that GPI failed to provide the documentation necessary to support a claim under the Policy, which could be considered an event of default under the Cash Advance Agreement.[31] Thus, the GPI Defendants' argument on this front is unavailing.

■ As to the second claim for relief, GPI likewise argues that the complaint's allegations against Active excuse GPI from performance under the Trade Finance Agreement.[32] The complaint alleges, however, that *both* GPI and Active breached the Trade Finance Agreement in ways that could be construed as material breach. For example, NatWest alleges that GPI: (1) failed to acquire goods and services through Active and its customers;[33] (2) failed to fulfill its obligations under and follow the specified procedures of the Countertrade Consumption Procedure;[34] and (3) failed to cooperate and work with Active to reach a level of purchases from Active and/or Active's customers sufficient to repay NatWest.[35] Thus, because it cannot be said at this time which party materially breached the Trade Finance Agreement first, if either even did so, dismissal of the second claim for relief against GPI is inappropriate.

■ Furthermore, it bears mentioning that to the extent that the allegations of Active's lack of performance under the Trade Finance Agreement are inconsistent with any allegation against the GPI Defendants, the inconsistency would not be a basis for dismissal. Under Fed.R.Civ.P. 8(e)(2), a plaintiff may plead "two or more

---

29. Cpt. ¶ 36. Under the Cash Advance Agreement, a default occurs when: "the [GPI Defendants] shall fail in any material respect to perform or observe any term, covenant or agreement contained in this [Cash Advance] Agreement or the Trade Credit Payment Agreement or [GPI] shall fail in any material respect to comply with the provisions of the Trade Finance Agreement (including the Countertrade Consumption Procedure as set forth in Section 4.1 thereof) on its part to be performed or observed." Cpt. Ex. B ¶ 8(b).

30. Cpt. ¶¶ 17–19 (alleging that Active failed to cooperate with GPI to achieve the level of purchases necessary for GPI to repay plaintiff, failed to provide GPI with sufficient opportunities to make purchases directly from Active or through its network, and failed to provide certain goods and services to GPI of equivalent quality to those GPI could obtain elsewhere and at competitive prices so that a percentage of the selling price could be paid to plaintiff).

31. A continuing failure to perform or observe any term, covenant or agreement contained in the Cash Advance Agreement constitutes default under the Cash Advance Agreement. Cpt. Ex. B ¶ 8(b). Under the Cash Advance Agreement, GPI covenanted to "comply with each and every obligation of [GPI] set forth in the Policy." Cpt. Ex. B ¶ 7(j). One such obligation is to provide the documentation necessary to support an insurance claim. Cpt. Ex. D § VI.

32. Unlike Active, GPI does not argue that NatWest is not an intended beneficiary of the Trade Finance Agreement and thus lacks standing to assert a claim under that contract. Even if it had, for the reasons set forth below, this argument would be unavailing.

33. Cpt. ¶ 15.

34. *Id.* ¶ 16.

35. *Id.* ¶ 17.

statements of a claim or defense alternately or hypothetically, either in one count . . . or in separate counts." [36]

### 2. Complaint Alleges Continuous Breach of Cash Advance Agreement

A triggering event must "occur and be continuing" to constitute a default under the Cash Advance Agreement.[37] The GPI Defendants claim that the complaint fails to allege any such triggering event and that the first claim therefore should be dismissed.[38]

As discussed above, the complaint can be read to allege that GPI violated the Cash Advance Agreement by failing to provide documentation to support a claim under the Policy.[39] As GPI essentially admits that it has not cured this possible breach,[40] the complaint does allege a breach of a continuing nature, and count one should not be dismissed against the GPI Defendants.

### C. Second Claim for Relief against Active for Breach of the Trade Finance Agreement

Active argues that count two of the complaint should be dismissed against it because NatWest was not an intended third-party beneficiary of the Trade Finance Agreement and therefore may not pursue a contract claim against Active.[41] This claim is without merit.

 Only an ·intended, as opposed to an incidental, beneficiary of a contract may assert a claim as a third-party beneficiary.[42] New York has embraced the Restatement (Second) of Contracts approach to determining whether a party is an intended beneficiary.[43] A third party is an intended beneficiary if:

"recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." [44]

 In assessing whether parties intend to permit a third party to enforce a contract, New York courts consider whether "no one other than the third party can recover if the promisor breaches the contract or [whether] the language of the contract otherwise clearly evidences an in-

---

**36.** E.g., Henry v. Daytop Vill., Inc., 42 F.3d 89, 95 (2d Cir.1994) ("Under Rule 8(e)(2) . . ., a plaintiff may plead two or more statements of a claim, even within the same count, regardless of consistency.").

**37.** Cpt. Ex. B ¶ 8(b).

**38.** GPI Defendants Mem. 12–13.

**39.** See supra note 31 and corresponding text.

**40.** See supra note 17.

**41.** Active Mem. 10.

**42.** Akcess Pacific Group LLC v. Winstar Communications Inc., 67 F.Supp.2d 394, 399 (S.D.N.Y.1999).

**43.** Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc., 66 N.Y.2d 38, 44, 495 N.Y.S.2d 1, 5, 485 N.E.2d 208 (1985) ("We think that the Restatement formulations state the essence of the prior holdings of this court while clearing away some of the unnecessary differentiations and circuitous language set forth in some of those decisions."); see also Trans–Orient Marine Corp. v. Star Trading & Marine, Inc., 925 F.2d 566, 573 (2d Cir.1991); Septembertide Publishing, B.V. v. Stein & Day, Inc., 884 F.2d 675, 679 (2d Cir.1989).

**44.** RESTATEMENT (SECOND) OF CONTRACTS § 302[1] (1981).

tent to permit enforcement by a third party."[45] "In determining third party beneficiary status it is permissible for the court to look at the surrounding circumstances as well as the agreement."[46]

■ The Trade Finance Agreement states that NatWest was to receive a direct benefit of the parties' performance, as it obliged GPI to make payment directly to NatWest equal to the amount of the trade credit reduction assigned by Active to each eligible purchase by GPI.[47] Performance by Active of its promise to assist GPI in using its trade credits would have assisted GPI in satisfying its obligation to reimburse NatWest. Indeed, the only mechanism by which NatWest was to receive repayment of its advance to GPI, other than in the event of default or through a claim under the Policy, was by GPI's exhaustion of its trade credits.[48] As the Trade Finance Agreement unambiguously reflects the parties' intention to benefit NatWest, NatWest is an intended third-party beneficiary of the agreement.[49]

This conclusion is reinforced by *Septembertide Publishing, B.V.*[50] The court there

held that an author was an intended third-party beneficiary of an agreement between the defendant publisher and its sublicensee of paperback publishing rights of the author's work ("Paperback Agreement").[51] The sublicense provided for payments to be made to the publisher by the defendant sublicensee New American Library.[52] The publisher in turn was obligated to make payments to the author under a separate agreement, a provision of which required the publisher to pay two-thirds of all sublicensing income to the author, while retaining one-third ("Hardcover Agreement").[53] When the publisher became insolvent, the author sought to recover sublicensing income directly from New American Library as a third-party beneficiary of the Paperback Agreement.[54]

The court found sufficient evidence that the publisher intended to benefit the author at the time the Paperback and Hardback Agreements were entered.[55] It noted that the two agreements were signed within one day of each other and that the Paperback Agreement referred to the au-

---

45. *Fourth Ocean Putnam Corp.*, 66 N.Y.2d at 45, 495 N.Y.S.2d at 5, 485 N.E.2d 208; *see also Piccoli v. Calvin Klein Jeanswear Co.*, 19 F. Supp.2d 157, 162 (S.D.N.Y.1998).

46. *Trans–Orient Marine Corp.*, 925 F.2d at 573.

47. Cpt. Ex. A § 4.3(ii).

48. Cpt. Ex. B ¶ 5. Note that the Trade Finance Agreement specifically refers to and incorporates the Cash Advance Agreement. Cpt. Ex. A § 4.3(ii) ("The remaining balance of Active's invoices will be satisfied by Active making the Trade Credit Reduction and Grant Prideco making a payment equal to such Trade Credit Reduction directly to NatWest in accordance with the Trade Credit Cash Advance Agreement by and between Grant Prideco and NatWest.").

49. *E.g., Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 569, 780

N.E.2d 166 (2002) ("a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."); *Thomas v. New York City*, 814 F.Supp. 1139, 1152 (S.D.N.Y.1993) (whether a party is a third-party beneficiary under a given contract is a mixed question of law and fact that depends on the provisions of the contract at issue).

50. 884 F.2d 675 (2d Cir.1989).

51. *Id.* at 679.

52. *Id.* at 677.

53. *Id.*

54. *Id.*

55. *Id.* at 679–80.

thor and his work.[56] The court took note also of the provision in the Hardback Agreement specifying the manner in which sublicense proceeds were to be divided between the author and publisher.[57] Finally, the court found that New American Library was chargeable with knowledge of the fact that the author was to benefit from the Paperback Agreement, as the author was identified by name and the contract contained references to the publisher's ongoing relationship with the author.[58]

Here, NatWest is mentioned specifically in numerous sections of the Trade Finance Agreement, including reference to the cash advance as a condition precedent of the Agreement[59] and a provision specifying the manner of payment to NatWest of the trade credit reductions.[60] Thus, Active knew of the benefit to be conferred on NatWest. The contemporaneity of the Trade Finance and Cash Advance Agreements lends further support to the conclusion that NatWest was an intended third-party beneficiary. Accordingly, the Court holds that the Trade Finance Agreement was intended to benefit plaintiff.[61]

## D. Breach of Covenant of Good Faith and Fair Dealing

In general, under New York law, a duty of good faith and fair dealing is implicit in every contract.[62] A claim of breach of that duty, however, will be dismissed as redundant where the conduct

---

**56.** *Id.* at 679.

**57.** *Id.* at 679–80.

**58.** *Id.* at 680.

**59.** Cpt. Ex. A § 5.0 ("A further condition of this Trade Finance Agreement shall be the receipt by Grant Prideco of a Cash Advance from NatWest in the amount of Three Million Forty–Three Thousand Five Hundred Forty–Two Dollars and Thirty–Three Cents (*sic*) ($3,443,542.00). Active will coordinate efforts with Grant Prideco and Natwest to assist Grant Prideco to obtain such Cash Advance in accordance with the terms of a Trade Credit Cash Advance Agreement by and between Grant Prideco and Natwest.")

**60.** *Id.* § 4.3(ii).

**61.** The cases relied upon by Active are not to the contrary. In *Salzman v. Holiday Inns, Inc.,* 48 A.D.2d 258, 259, 369 N.Y.S.2d 238, 240 (4th Dep't 1975), Holiday Inns agreed to construct a motel on land owned by the plaintiff, and to provide interim financing for the same, provided plaintiff obtained a commitment for permanent financing to repay Holiday Inns. Holiday Inns later brought suit as a purported third-party beneficiary of the financing agreement between plaintiff and the permanent lender. *Id.,* 48 A.D.2d at 260, 369 N.Y.S.2d at 241. The court found that Holiday Inns was merely an incidental, rather than an intended beneficiary of the agreement, because it called for the permanent lender to pay money to plaintiff, not to Holiday Inns. *Id.,* 48 A.D.2d at 262, 369 N.Y.S.2d at 242–43. By contrast, the Trade Finance Agreement explicitly states that any designated trade credit reduction amounts, which could be generated only upon Active's performance of its obligations under the agreement, would be paid to NatWest. Likewise *HBL Indus. v. Chase Manhattan Bank, N.A.,* 45 B.R. 865 (S.D.N.Y.1985) is distinguishable because the agreement under which plaintiff claimed rights as an intended third-party beneficiary did not manifest specific intent to benefit plaintiff—it merely established a fund out of which a shipbuilding company was to satisfy invoices of its suppliers—whereas the Trade Finance Agreement explicitly provided that GPI was to pay the value of trade credit reductions directly to NatWest. *See also Tomaso, Feitner & Lane, Inc. v. Brown,* 4 N.Y.2d 391, 393, 175 N.Y.S.2d 73, 74, 151 N.E.2d 221 (1958) (no intent to confer benefit on plaintiff could be inferred from agreement); *First Capital Asset Mgmt., Inc. v. N.A. Partners, L.P.,* 260 A.D.2d 179, 688 N.Y.S.2d 25 (1st Dep't 1999) (same).

**62.** *Houbigant v. ACB Mercantile, Inc.,* 914 F.Supp. 964, 989 (S.D.N.Y.1995); *see also Geler v. Nat'l Westminster Bank USA,* 770 F.Supp. 210, 215 (S.D.N.Y.1991).

allegedly violating the implied covenant is a predicate also for a claim for breach of an express provision of the contract.[63]

 The allegations of breach of the covenant of good faith and fair dealing against GPI, Weatherford and Active are no different from the allegations of breach of express terms covered by other parts of the complaint. Accordingly, this count will be dismissed, and plaintiff's request for leave to amend to include the allegations of breach of the duty of good faith and fair dealing in the first and second counts will be denied.

### E. *Unjust Enrichment*

 Plaintiff's unjust enrichment claim against the GPI Defendants and Active fails because " '[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery . . . for events arising out of the same subject matter.' " [64] Here, the GPI Defendants concede that the trade barter agreements are enforceable against them,[65] and the Court has held that NatWest may enforce the Trade Finance Agreement against Active. The allegations of the unjust enrichment count relate solely to the contracts. It fails for the simple reason that "[i]t is impermissible . . . to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." [66]

 This result as to Active would be the same even if NatWest were not a third-party beneficiary of the Trade Finance Agreement, as NatWest has failed to allege facts sufficient to state a claim of unjust enrichment against Active. " 'To state a cause of action for unjust enrichment, a plaintiff must allege that it conferred a benefit upon the defendant, and that the defendant will obtain such benefit without adequately compensating plaintiff therefor.' " [67] Thus, "[a] claim for unjust enrichment will 'lie[ ] only where the defendant possesses money or received a benefit which in equity and good conscience the defendant should not retain because it *belongs to the plaintiff.*' " [68] NatWest, however, has no possessory interest in the advance freely paid to GPI.[69]

**63.** *E.g., Houbigant,* 914 F.Supp. at 989 (citing *Geler,* 770 F.Supp. at 215).

**64.** *AdiPar Ltd. v. PLD Int'l Corp.,* No. 01 Civ. 0765(MBM), 2002 WL 31740622, at *11 (S.D.N.Y. Dec. 6, 2002) (quoting *Clark–Fitzpatrick, Inc. v. Long Island R.R.,* 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190 (1987)); *see also Bradkin v. Leverton,* 26 N.Y.2d 192, 197, 309 N.Y.S.2d 192, 195, 257 N.E.2d 643 (1970).

**65.** GPI and Weatherford Reply Mem. 4–5.

**66.** *Clark–Fitzpatrick, Inc.,* 70 N.Y.2d at 389, 521 N.Y.S.2d at 656, 516 N.E.2d 190; *see also AdiPar Ltd.,* 2002 WL 31740622, at *12 (unjust enrichment claim not properly pleaded as an alternative to a breach of contract claim where existence of contract, the scope of which clearly covered the subject dispute, was undisputed); *Augienello v. Coast–to–Coast*

*Fin. Corp.,* No. 01 Civ. 11608(RWS), 2002 WL 1822926, at *6 (S.D.N.Y. Aug.7, 2002) (same).

**67.** *Smith v. Chase Manhattan Bank, USA, N.A.,* 293 A.D.2d 598, 600, 741 N.Y.S.2d 100, 102 (2d Dep't 2002) (quoting *Nakamura v. Fujii,* 253 A.D.2d 387, 390, 677 N.Y.S.2d 113, 116 (1st Dep't 1998)).

**68.** *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.,* No. 97 Civ. 4978(LMM), 1999 WL 47223, at *4 (S.D.N.Y. Feb.3, 1999) (citing *Martes v. USLIFE Corp.,* 927 F.Supp. 146, 149 (S.D.N.Y.1996) (emphasis added)).

**69.** *See Panix Promotions, Ltd. v. Lewis,* No. 01 Civ. 2709(HB), 2002 WL 122302, at *2 (S.D.N.Y. Jan.22, 2002) (plaintiff has no possessory interest in money freely given to defendant with expectation of performance); *United Republic Ins. Co. v. Chase Manhattan*

It knew when it advanced the funds that a portion would be used immediately by GPI to purchase trade credits from Active. It agreed to be repaid not out of the specific funds advanced, but instead out of cash savings GPI stood to realize from use of its trade credits. Accordingly, there is no basis for asserting that Active would be enriched unjustly at NatWest's expense even if NatWest were not entitled to sue Active as a third-party beneficiary of the Trade Finance Agreement.

### F. Joinder of Reliance as Necessary Party

The GPI Defendants argue that this action should be stayed until Reliance is joined as a necessary party. Pursuant to Fed.R.Civ.P. 19(a), joinder of a party is necessary if:

"(1) in the person's absence complete relief cannot be accorded among those already parties, or

"(2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may

"(i) as a practical matter impair or impede the person's ability to protect that interest or

"(ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest."

Bank, 168 F.Supp.2d 8, 19 (N.D.N.Y.2001), order of affirm. vacated and remanded for reconsideration on other grounds, 315 F.3d 168 (2d Cir.2003) ("[Plaintiff] cannot now claim a possessory or ownership interest in that which it freely gave away as a .loan in a contract that was bargained for and supported by consideration. The claim here is essentially a breach of contract claim for the [defendant's] failure to repay the loan from [plaintiff].").

■ As to the first prong, joinder of Reliance is not necessary for the court to render complete relief "among those already joined."[70] Likewise, it is not clear that disposition of this action in Reliance's absence will impair or impede its ability to protect its interests or leave any of the existing parties subject to a substantial risk of incurring multiple, or otherwise inconsistent obligations. Accordingly, Reliance is not a necessary party pursuant to Fed.R.Civ.P. 19.

### Conclusion

For the foregoing reasons, defendants' motions to dismiss the complaint are granted to the extent that counts three and four are dismissed. They are denied in all other respects.

SO ORDERED.

**70.** 4 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE ¶ 19.03[2][b] (3d ed.2000) (emphasis in original); see also Arkwright–Boston Mfrs. Mut. Ins. Co. v. City of New York, 762 F.2d 205, 209 (2d Cir.1985) ("[T]he term complete relief refers only 'to relief as between the persons already parties, and not as between a party and the absent person whose joinder is sought.' ").