**Rory HOLLOWAY and John Horne, Plaintiffs,**

v.

**Don KING, et al., Defendants.**

**No. 04 Civ. 7384(LAK).**

United States District Court, S.D. New York.

March 28, 2005.

Michael Flomenhaft, Flomenhaft & Cannata, LLP, for Plaintiffs.

Peter E. Fleming Jr., Benard V. Preziosi, Jr., Philip Moustakis, Curtis, Mallet–Prevost, Colt & Mosle LLP, for Defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Rory Holloway and John Horne, formerly managers for the boxer Mike Tyson, brought this action against promoter Don King and various corporate entities he controls (collectively "King") alleging that King breached a 1995 oral agreement to give each of the plaintiffs 10 percent of all of King's earnings from exploiting Tyson's fights.[1] King has moved to dismiss pursuant to Rules 12(b)(6) and 9(b).

*Facts*

### A. The Complaint

Mike Tyson was a world heavyweight boxing champion. The complaint alleges that on or about August 16, 1994, Tyson and the plaintiffs executed a contract according to which "in exchange for plaintiffs' services, skills, talents and expertise in the world of professional boxing, Tyson agreed to pay" each of the plaintiffs 10 percent of Tyson's gross revenues.[2]

---

1. The action named also as a defendant Charles E. Lomax. The Court granted his unopposed motion to dismiss in an order dated March 17, 2005.

2. Cpt. ¶¶ 44–45.

The complaint further alleges that on or about June 28, 1994, Tyson and King entered into an agreement (the "Promotion Agreement") that granted King "the sole and exclusive right to promote Tyson's bouts ... for the four year period following Tyson's release from prison. If Tyson became champion, the contract could have been extended for an additional two years." [3]

We come next to the crux of the complaint, which is the allegation of an oral "Team Tyson Agreement":

> "On or about January 1995, KING, Tyson, HOLLOWAY and HORNE agreed that KING would receive 30% of Tyson's purse and bonus money in exchange for giving Tyson, HOLLOWAY and HORNE 50%, 10% and 10% respectively, of all of KING's and his controlled companies' earnings from *ALL* of their worldwide promotion and exploitation of the Tyson fights. This was the 'Team Tyson Agreement' and it was an oral agreement." [4]

On March 20, 1995, King and Tyson entered into an agreement dated as of March 17, 1995 with SET Pay Per View and Showtime Networks Inc. (collectively, "Showtime") giving Showtime and King the exclusive rights to stage and distribute Tyson's fights during a three-year period that was to include ten fights (the "Showtime Agreement"). [5] Among other things, the Showtime Agreement provided that King and Showtime jointly would "(a) exploit (in accordance with the provisions of this agreement) all of the worldwide rights to [Tyson's fights] ... and (b) share in the proceeds received from all such exploitation as provided [in the agreement]," [6] and that Showtime would pay King a $43 million signing bonus. [7]

On May 24, 1995, King entered into an agreement with MGM Grand Hotel, Inc. and MGM Grand, Inc. (collectively, "MGM Grand") giving MGM Grand the exclusive right to host the next six Tyson fights, all to take place before September 25, 1997 (the "MGM Grand Agreement"). [8] In connection with the agreement, MGM Grand advanced King $15 million in cash, sold him treasury stock for $15 million (the "MGM Grand Shares"), and guaranteed that the shares would be worth at least $30 million at the end of the agreement term. King was to repay the cash advance, but he was entitled to the gross receipts from ticket sales less certain expenditures (the "Net Gate") for each of the six fights covered by the agreement. [9]

On December 28, 1995, Tyson, King, and the plaintiffs executed an agreement dated

---

**3.** *Id.* ¶ 52.

**4.** *Id.* ¶ 54.

**5.** Preziosi Aff. Ex. B. 1–2.
   The plaintiffs did not submit with the complaint the Showtime Agreement or any of the other written agreements to which the complaint makes reference. The Court nonetheless considers as part of the complaint the texts of the agreements submitted by King. On a motion to dismiss, "[e]ven where a document is not incorporated by reference" into the complaint, "the court may nevertheless consider [the document] where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Cham-*

*bers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002) (citation omitted); *accord Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004). In this case, the complaint's reference to the terms, and reliance on the effect, of the Showtime Agreement and the two other agreements to be discussed below render the texts of those agreements "integral" to the complaint.

**6.** Preziosi Aff. Ex. B. ¶ 1.

**7.** *Id.* ¶ 3(a).

**8.** Preziosi Aff. Ex. C. § 1.

**9.** *Id.* ¶¶ 5.1, 5.4.

as of March 17, 1995 (the "December 28, 1995 Agreement") that provided in relevant part:

"This letter agreement will serve to set forth the terms and conditions of 'Team Tyson' to which we have agreed. Specifically, it sets forth the agreement among [King], Mike Tyson ('Mike'), John Horne ('John') and Rory Holloway ('Rory') with respect to (i) [the Showtime Agreement] and (ii) [the MGM Grand Agreement]...."

"With respect to the Showtime Agreement, (i) [King] hereby conveys, transfers and assigns to each of Mike, John and Rory, 50%, 10%, and 10%, respectively (each, a 'pro rata share'), of (a) the $43 million Bonus ... and (b) [King]'s share of the remaining amounts allocated to [King] under [a clause of the Showtime Agreement giving King 50 percent of residual revenues] ... and (ii) Mike hereby conveys, transfers and assigns to each of [King], John and Rory, 30%, 10% and 10%, respectively, of each of the Tyson purses to which he is entitled under the Showtime Agreement...."

"With respect to the MGM Agreement, [King] hereby conveys, transfers and assigns to each of Mike, John and Rory, his pro rata share of (i) the $15 million Advance ..., (ii) [the MGM Grand Shares] ..., (iii) the first $5 million of Net Gate from each of the first three Tyson Events ..., (iv) the Net Gate, if any, from each Tyson Event in excess of the Net Gate which is included in 'Gross Revenue' (as defined in the Showtime Agreement) ..., and (v) the $30 million dollar Guarantee."

...

"This letter agreement supersedes all prior agreements, whether written or oral ... between or among any of the parties hereto with respect to the subject matter contained herein and therein, and such agreement embodies the entire understanding among the parties relating to such subject matter." [10]

The complaint alleges that from 1995 to 1997, Tyson participated in six fights subject to the Team Tyson Agreement and that King received 30 percent of Tyson's purse money for those fights.[11] Tyson allegedly repudiated the Team Tyson Agreement after his second fight with Evander Holyfield, which took place on June 28, 1997, and "fired KING as his promoter and fired HOLLOWAY and HORNE as his managers." [12]

According to the plaintiffs:

"Once the Team Tyson Agreement was repudiated in 1997, HOLLOWAY and HORNE ... realized that they had only received 10% (each) of the Tyson purses and the Showtime and MGM bonuses, and had not received any money as a result of KING's and his controlled companies' worldwide promotion and exploitation of the six Tyson fights that were fought pursuant to the Team Tyson Agreement." [13]

The complaint next alleges that from 1997 until March 2004, "HOLLOWAY and HORNE repeatedly and continuously" asked King for a full accounting of the promotion and exploitation earnings and for the 10 percent each allegedly was promised under the Team Tyson Agreement, which King "repeatedly and continuously" assured the plaintiffs they would receive.[14] The plaintiffs further allege that:

**10.** Preziosi Aff. Ex. D.

**11.** Cpt. ¶ 58.

**12.** *Id.* ¶ 62.

**13.** *Id.* ¶ 64.

**14.** *Id.* ¶¶ 65–66.

"KING repeatedly told HOLLOWAY and HORNE that before he could pay them, he needed to resolve litigation that was ongoing between him and Tyson.... As a sign of good faith, KING ... made periodic payments to HOLLOWAY and HORNE between 1997 and 2004 in excess of one and a half million ... dollars, alleviating HOLLOWAY's and HORNE's concerns that KING would repudiate his promise." [15]

Finally, the complaint alleges that on or about March 2004, "KING repudiated his promise to provide HOLLOWAY and HORNE with a complete accounting and pay them the 10% of the worldwide promotion profits to which they were entitled." [16]

The complaint asserts causes of action for breach of contract, for fraudulent inducement, for breach of fiduciary duty, for fraud and fraudulent concealment, for unjust enrichment, and for an accounting, all arising out of King's alleged failure to fulfill his obligations to the plaintiffs under the Team Tyson Agreement.

The action was commenced in New York Supreme Court and removed here on the basis of diversity of citizenship.

## B. The Motion to Dismiss

King asserts that all of the causes of action are barred by the statute of limitations, that the contract claim is barred as well by the statute of frauds and fails under the parol evidence rule, that the fraud and breach of fiduciary duty claims fail to set forth essential elements of those causes of action, that the fraud claims are not pleaded with particularity, and that the unjust enrichment and accounting claims are redundant of the contract claim. Horne, but not Holloway, opposes the motion.

## Discussion

### A. Standards Governing Motions to Dismiss

In deciding a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor.[17] Dismissal is inappropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." [18]

### B. Choice of Law

The complaint does not set forth sufficient facts to determine the state the law of which applies to the claims in this case. King has addressed primarily New York law, but his discussions of the statute of limitations and the statute of frauds refer also to the law of Florida (the principal place of business of some of the defendant entities and the state in which Don King resides) and Nevada (the law governing the MGM Grand Agreement[19]). Horne has not addressed choice-of-law issues at all but has briefed mainly New York law.

The Court therefore will apply New York law,[20] except to note parenthetically

15. *Id.* ¶ 66.

16. *Id.* ¶ 67.

17. *E.g., Flores v. South Peru Copper Corp.,* 343 F.3d 140, 143 (2d Cir.2003); *Levy v. Southbrook Int'l Invs., Ltd.,* 263 F.3d 10, 14 (2d Cir.2001).

18. *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

19. Preziosi Aff. Ex. C § 23.

The Showtime Agreement was to be governed by New York law. Preziosi Aff. Ex. B ¶ 7(a).

20. *See Santalucia v. Sebright Transp., Inc.,* 232 F.3d 293, 296 (2d Cir.2000) ("The parties' briefs assume that New York law controls this dispute, and such 'implied consent ... is sufficient to establish choice of law.'" (citation omitted)); *accord IBM Corp. v. Liberty Mut. Fire Ins. Co.,* 303 F.3d 419, 423 (2d Cir.2002).

the applicable statutes of frauds in Florida, Nevada, and California, the state in which Horne resides.

## C. First Cause of Action: Breach of Contract

### 1. Statute of Frauds Defense

King argues that the contract claim is barred by the statute of frauds. In New York, an agreement that "[b]y its terms is not to be performed within one year from the making thereof" is void unless in writing.[21] King argues that the alleged oral Team Tyson Agreement is within the statute because the Promotion Agreement, the Showtime Agreement, and the MGM Grand Agreement all indicate that the parties to the Team Tyson Agreement contemplated performance of their revenue-splitting obligations for an indefinite duration greater than a year.

Horne responds that the Team Tyson Agreement is not within the statute of frauds because "there are no terms in the oral agreement, as alleged, which mandate that performance could not occur within one year."[22] Horne points out that the complaint is silent as to the duration of the Team Tyson Agreement and that the Showtime and MGM Grand Agreements were made only after the alleged Team Tyson Agreement.

In resolving this issue, the Court first notes that King is correct that the alleged Team Tyson Agreement called for performance of an indefinite duration.

Here, again, is the relevant portion of the complaint:

"On or about January 1995, KING, Tyson, HOLLOWAY and HORNE agreed that KING would receive 30% of Tyson's purse and bonus money in exchange for giving Tyson, HOLLOWAY and HORNE 50%, 10% and 10% respectively, of all of KING's and his controlled companies' earnings from ALL of their worldwide promotion and exploitation of the Tyson fights. This was the 'Team Tyson Agreement' and it was an oral agreement."

There was no time limit to these alleged obligations. Even if all of Tyson's fights occurred within the one-year period following the making of the Team Tyson Agreement, King's alleged obligations to share seventy percent of his promotion earnings with Tyson and the plaintiffs would continue indefinitely. Similarly, even if King made no money at all from promoting Tyson's fights, a Tyson fight occurring years after the making of the Team Tyson Agreement [23] would be subject to the requirement that Tyson and the plaintiffs share 30 percent of Tyson's prize money with King.

This case, then, is controlled squarely by a line of New York Court of Appeals cases concerning alleged licensing and employment contracts found to be within the statute because, as the Court of Appeals itself explained in a 1998 decision:

"a contractual obligation to remit newly arising payments would continue indefinitely without any means of termination

---

**21.** N.Y. GEN. OBLIG. LAW § 5–701(a)(1) (McKinney 2005).

The California and Nevada statutes have nearly identical wording. See CAL. CIVIL CODE § 1624(a)(1) (West 2005); NEV.REV.STAT. ANN. § 111.220(1) (West 2005). The Florida statute applies to any agreement "that is not to be performed within the space of 1 year from the making thereof[.]" FLA. STAT. ANN. § 725.01 (West 2005).

**22.** Horne Mem. 12.

**23.** If a Tyson fight were not promoted by King, presumably the Team Tyson Agreement would not have applied to that fight. But under the Promotion Agreement alleged to have been made before the Team Tyson Agreement, King was to be the exclusive promoter of Tyson's fights for at least four years.

by the [defendant].... Such continuing responsibilities of the [defendant] would necessitate new payments to the plaintiff indefinitely. Thus, plaintiff ... was seeking to charge [the defendant] with indefinite liability in the absence of any writing ... to evince the assumption of such continuing obligations."[24]

The cases to which the Court was referring involved alleged agreements under which defendants allegedly undertook to pay the plaintiff $5,000 a year for every year in which the defendant used an advertisement designed by the plaintiff,[25] to

continue a subdistributorship granted to plaintiffs "for as long as [the plaintiff and its predecessors] satisfactorily distributed the product ...,"[26] and to pay plaintiffs percentage commissions on sales from certain customers.[27]

It is true that the Court of Appeals has found some contracts setting forth obligations of potentially infinite duration to fall outside the statute of frauds. But those cases do not control here because all of them involved relationships that expressly were made terminable by one or both parties within a year.[28] The Court of

**24.** *Cron v. Hargro Fabrics, Inc.*, 91 N.Y.2d 362, 369, 670 N.Y.S.2d 973, 977, 694 N.E.2d 56 (1998) (referring to *D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 63 N.Y.2d 449, 483 N.Y.S.2d 164, 472 N.E.2d 992 (1984), *Shirley Polykoff Adver., Inc. v. Houbigant, Inc.*, 43 N.Y.2d 921, 403 N.Y.S.2d 732, 374 N.E.2d 625 (1978), *Zupan v. Blumberg*, 2 N.Y.2d 547, 161 N.Y.S.2d 428, 141 N.E.2d 819 (1957), *Martocci v. Greater N.Y. Brewery, Inc.*, 301 N.Y. 57, 92 N.E.2d 887 (1950), and *Cohen v. Bartgis Bros. Co.*, 264 A.D. 260, 35 N.Y.S.2d 206 (1942), *aff'd*, 289 N.Y. 846, 47 N.E.2d 443 (1943)).

**25.** *Shirley Polykoff Adver., Inc.*, 43 N.Y.2d at 922, 403 N.Y.S.2d at 733, 374 N.E.2d 625 ("Defendant's failure to use the advertisement for any period of time, however long, does not, of course, terminate the contract. Clearly, defendant could not have terminated his contractual obligations by simply waiting a year before using it .... [or] by temporarily suspending use of the advertisement for a year.... Thus, the contract cannot by its own terms be performed within a year....").

**26.** *D & N Boening, Inc.*, 63 N.Y.2d at 456–58, 483 N.Y.S.2d at 166–68, 472 N.E.2d 992 ("[O]ther than ... a breach, there was no provision under the terms of the agreement for it to come to an end. Neither party had an option to cancel, and there was no specified time or event which automatically would cause the agreement to terminate.").

**27.** *Zupan*, 2 N.Y.2d at 552, 161 N.Y.S.2d at 431, 141 N.E.2d 819 ("It was within the contemplation of the parties ... that the customer might give orders for years.... The contract was not, then, one which might be

performed within a year, but rather one which could only be terminated within that period by a breach of one or the other party to it."); *Martocci*, 301 N.Y. at 60, 62–63, 92 N.E.2d 887 ("The endurance of defendant's liability is the deciding factor. The mere cessation of orders from [the relevant customer] to defendant would not alter the contractual relationship between the parties; it would not constitute performance; plaintiff would still be in possession of his contractual right, though it may have no monetary value, immediately or ever."); *Cohen*, 264 A.D. at 260–61, 35 N.Y.S.2d at 207–08 ("It is true that if [the relevant customer] should place no orders with the defendant within the year, no commissions would be earned, but *the defendant's contract would not thereby have been 'performed'*, for it would then apply to any orders that might be accepted in succeeding years.... [T]he contract here requires the defendant, for an unlimited period of time, to pay commissions on orders accepted from [the relevant customer] and, therefore, is impossible of performance within a year.").

**28.** *See Weiner v. McGraw–Hill, Inc.*, 57 N.Y.2d 458, 463, 457 N.Y.S.2d 193, 196, 443 N.E.2d 441 (1982) (employment agreement, whether viewed as at-will or as allowing discharge only for just cause, not within statute); *North Shore Bottling Co. v. C. Schmidt and Sons, Inc.*, 22 N.Y.2d 171, 174, 292 N.Y.S.2d 86, 87–88, 239 N.E.2d 189 (1968) (alleged agreement under which plaintiff became exclusive distributor of defendant's beer "[f]or as long as [defendant] sold beer in the New York metropolitan area" held not within statute of

Appeals has distinguished between contracts that contemplate the possibility of termination within one year and contracts that can be terminated within one year only by a breach: "termination of an agreement as a result of its breach is not performance thereof within the meaning of the Statute of Frauds, and an oral agreement which by its own terms must continue for more than a year unless terminated by its breach is void." [29] For the reasons discussed above, the Team Tyson Agreement falls in the latter category.

Accordingly, the Team Tyson Agreement is within the statute of frauds and therefore unenforceable because not in writing.[30]

### 2. The Parol Evidence Rule

King argues as well that the contract claim fails under the parol evidence rule. The Court notes that the parol evidence rule, despite its name, is a rule of substantive law,[31] and courts sometimes rely on it to grant Rule 12(b)(6) motions to dismiss contract claims.[32]

■■■ Parol evidence to vary, contradict, or supplement the terms of a fully integrated agreement is not admissible.[33] Absent an allegation of fraud,[34] the presence of an integration or merger clause triggers the parol evidence rule in New York.[35]

---

frauds); *Nat Nal Serv. Stations, Inc. v. Wolf,* 304 N.Y. 332, 334, 107 N.E.2d 473 (1952) (agreement allegedly providing that "so long as plaintiff purchased from [certain oil companies] its requirements for gasoline ... through the defendants and the defendants accepted the same, the defendants would pay to the plaintiff an amount equal to the discount allowed to defendants by said [oil companies] ...." held not within statute).

**29.** *D & N Boening, Inc. v. Kirsch Beverages, Inc.,* 63 N.Y.2d at 457, 483 N.Y.S.2d at 167, 472 N.E.2d 992 (1984) (distinguishing *North Shore Bottling Co., Nat Nal Serv. Stations, Inc.,* and *Weiner,* among others); *accord North Shore Bottling Co.,* 22 N.Y.2d at 176–77, 292 N.Y.S.2d at 89–91, 239 N.E.2d 189.

**30.** Horne's argument that various writings memorialize parts of the Team Tyson Agreement is meritless. The contract being sued on is not one represented by these writings—the complaint alleges no breach of the written instruments—but rather the alleged oral agreement. Also meritless is Horne's argument that King's alleged promise is enforceable despite the statute of frauds because of the doctrine of promissory estoppel. That doctrine is inapplicable where, as here, the plaintiffs have alleged no reliance of any kind, let alone detrimental or injurious reliance, on the promise in question.

**31.** *See* 58 N.Y. Jur. 2d *Evidence and Witnesses* § 565 (2000) ("The parol evidence rule denying effect to an oral agreement contradicting a written contract entered into at the same time or later, is not merely a rule of evidence, but is also one of positive or substantive law, which, when applicable, defines the limits of the contract.").

**32.** *E.g., Dujardin v. Liberty Media Corp.,* 359 F.Supp.2d 337, 357, 2005 WL 612835, at *18 (S.D.N.Y. 2005); *Stamelman v. Fleishman–Hillard, Inc.,* No. 02 Civ. 8318(SAS), 2003 WL 21782645, at *3 (S.D.N.Y. July 31, 2003); *Western Intermodal Servs., Ltd. v. Singamas Container Indus. Co.,* No. 98 Civ. 8275(RPP), 2000 WL 343780, at *1 (S.D.N.Y. March 31, 2000).

**33.** *E.g., Primex Int'l Corp. v. Wal–Mart Stores, Inc.,* 89 N.Y.2d 594, 600, 657 N.Y.S.2d 385, 388, 679 N.E.2d 624 (1997); *Marine Midland Bank–Southern v. Thurlow,* 53 N.Y.2d 381, 387, 442 N.Y.S.2d 417, 419, 425 N.E.2d 805 (1981).

**34.** The complaint does not allege that the December 28, 1995 Agreement was procured by fraud. Horne's request for leave to amend the complaint to incorporate such an allegation is addressed below.

**35.** *See, e.g., Primex Int'l Corp.,* 89 N.Y.2d at 599, 657 N.Y.S.2d at 388, 679 N.E.2d 624 ("the purpose of a general merger provision ... is to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing"); *Sabo v. Delman,* 3 N.Y.2d 155, 161, 164 N.Y.S.2d 714, 717–18, 143 N.E.2d 906 (1957); *Daiichi Seihan USA,*

■ Here the December 28, 1995 Agreement contains a broad integration clause, and the agreement specifically notes its subject matter at the beginning: "This letter agreement will serve to set forth the terms and conditions of 'Team Tyson' to which we have agreed." The December 28, 1995 Agreement thus by its own terms supersedes the alleged oral Team Tyson Agreement. Horne's arguments that the December 28, 1995 Agreement did not represent the entirety of the Team Tyson Agreement subject matter are meritless.[36]

Accordingly, even if the oral Team Tyson Agreement were not within the statute of frauds, the breach of contract cause of action still would fail to state a claim on which relief can be granted.

### D. Second and Fourth Causes of Action: Fraudulent Inducement and Fraud / Fraudulent Concealment

In the second cause of action, the plaintiffs allege that they:

"were induced to enter the Team Tyson Agreement ... based upon KING's ... representations, that in exchange for his receipt of 30% of Tyson's purses and bonuses, he would convey to Tyson, HORNE and HOLLOWAY, 50%, 10% and 10%, respectively of all of KING's and his controlled companies' earnings from *ALL* of their worldwide promotion and exploitation of the Tyson fights." [37]

■ This allegation fails to state a claim upon which relief can be granted. Under New York law, the elements of fraud in the inducement are: "representation of a material existing fact, falsity, scienter, deception, and injury." [38] Where

---

*Inc. v. Infinity USA, Inc.*, 214 A.D.2d 487, 488, 625 N.Y.S.2d 527, 528 (1st Dep't 1995) ("Any attempt by defendant to alter the plain meaning of the contract by alleged oral modifications fails as a result of the contract's integration clause"); *Norman Bobrow & Co. v. Loft Realty Co.*, 178 A.D.2d 175, 175, 577 N.Y.S.2d 36, 36 (1st Dep't 1991) ("Parol evidence is not admissible to vary the terms of a written contract containing a merger clause"); *Balzano v. Lublin*, 162 A.D.2d 252, 253, 556 N.Y.S.2d 610, 611 (1st Dep't 1990) (same).

**36.** Horne makes two arguments in support of this proposition. First:

"It flies in the face of reason that the December 28, 1995 agreement, a four-page contract whose substance can fit on two pages[,] was to encompass the entirety of a fee splitting agreement between the most famous boxing promoter in the world, the highest paid athlete in all of sports, and his two managers." Horne Mem. 3.

This argument is outrageous. Surely it flies even more in the face of reason that the entirety of a yet broader fee-splitting agreement for yet more money among the most famous boxing promoter in the world, the highest paid athlete in all of sports, and his

two managers would be based on nothing more than an oral agreement. And yet that proposition is the basis of this lawsuit.

Second, Horne argues that the fact that the December 28, 1995 Agreement was amended several times to clarify the rights of the parties indicates that that agreement was not integrated. The argument is frivolous. First of all, these amendments were not mentioned in the complaint and therefore are not a proper subject of consideration on this motion. Second, when a written document expressly supersedes prior understandings, the making of amendments to the document does not resurrect the superseded prior understandings.

**37.** Cpt. ¶ 77.

**38.** *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833 (1958); *accord Dalessio v. Kressler*, 6 A.D.3d 57, 61, 773 N.Y.S.2d 434, 437 (2d Dept.2004); *Sokolow, Dunaud, Mercadier & Carreras LLP v. Lacher*, 299 A.D.2d 64, 70, 747 N.Y.S.2d 441, 446 (1st Dept.2002); *see also Lewis v. Don King Prods., Inc.*, 94 F.Supp.2d 430, 439 (S.D.N.Y.2000); *Frankel v. ICD Holdings S.A.*, 930 F.Supp. 54, 65 (S.D.N.Y.1996).

a complaint "does not state the specific promises or omissions of material facts allegedly made by [a defendant], it alleges nothing more than a breach of the contract ...; it does not allege a cause of action for fraud in the inducement." [39] Here the complaint contains no allegation that King misrepresented a material existing fact. Even if the complaint were construed to allege that King misrepresented an intention to perform, it would be insufficient. "General allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support [a fraud in the inducement] claim." [40] The plaintiffs' second claim is entirely duplicative of the claim for breach of contract, and must be dismissed.

As for the fraud and fraudulent concealment cause of action, Horne concedes that it "is insufficiently and inadequately pleaded." [41] Accordingly, the fourth cause of action will be dismissed.

### E. Third Cause of Action: Breach of Fiduciary Duty

The complaint alleges that:

"[King] fostered a special relationship with all members of Team Tyson, and convinced HOLLOWAY and HORNE to place complete trust and confidence in [him]. [King] acted as Team Tyson's representative[ ], and [he] caused all members of Team Tyson to believe that [King] would look solely to advance and protect the financial interests of all members of Team Tyson, including HOLLOWAY and HORNE, by securing meaningful financial participation for Team Tyson in all transactions relating to Tyson's boxing services. KING controlled every aspect of the finances regarding the Team Tyson Agreement.... As a result, [King] had a fiduciary duty to all members of Team Tyson, and [was] obligated to act solely in Team Tyson's best interest, which included HOLLOWAY and HORNE." [42]

The complaint further alleges that King breached this duty by failing to disclose all sources of revenue, to provide a complete accounting of promotion income, and to pay the plaintiffs their ten percent shares.[43]

■ The plaintiffs have failed to make out a claim of breach of fiduciary duty. "A conventional business relationship, without more, does not become a fiduciary relationship by mere allegation." [44] As one court has explained:

"Under New York law, a fiduciary relationship exists from the assumption of control and responsibility, and is founded upon trust reposed by one party in the integrity and fidelity of another. A fiduciary relationship cannot arise between parties to an arms length commercial transaction absent extraordinary circumstances." [45]

**39.** *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318, 639 N.Y.S.2d 283, 289, 662 N.E.2d 763 (1995).

**40.** *Id.; accord Pfizer, Inc. v. Stryker Corp.*, No. 02 Civ. 8613 LAK, 2003 WL 21660339, at *1 (S.D.N.Y. July 15, 2003) ("a claim of breach of contract may not be transformed into a fraud claim simply by an allegation that the promissor, at the time the contract was agreed upon, did not intend to perform or that it deliberately breached its obligations").

**41.** Horne Mem. 14.

**42.** Cpt. ¶ 81.

**43.** *Id.* ¶ 82.

**44.** *Argonaut P'ship L.P. v. Bankers Trustee Co.*, No. 96 Civ.1970(LLS), 2001 WL 585519, at *3 (S.D.N.Y. May 30, 2001) (quoting *Oursler v. Women's Interart Ctr., Inc.*, 170 A.D.2d 407, 408, 566 N.Y.S.2d 295, 297 (1st Dep't 1991)).

**45.** *Credit Suisse First Boston Mortgage Capital LLC v. Cohn*, No. 03 Civ 6146(DC), 2004 WL 1871525, at *5 (S.D.N.Y. Aug.19, 2004) (internal citations omitted) (citing *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 678–79 (S.D.N.Y.1991)); *accord VTech Holdings Ltd. v. Pricewaterhouse Coopers LLP*, 348

■ In this case, the complaint describes only an agreement to share revenues. The conclusory allegations of a "special relationship," "complete trust and confidence," and a belief by the plaintiffs that King "would look solely to advance and protect the financial interests of all members of Team Tyson" does not transform an ordinary commercial relationship into a fiduciary relationship.

The third claim will be dismissed.

### F. Fifth Cause of Action: Unjust Enrichment

The fifth cause of action alleges that:

"[t]he aforesaid activities have deprived plaintiffs of monies due and owing to them. Defendant KING's breach of contract resulted in an unjustifiable windfall to said defendant.... Under the circumstances described above, it would be inequitable for defendants to retain the benefits of their wrongful conduct without paying Plaintiffs the value of such benefits."[46]

This is a claim sounding in quasi-contract.[47]

■ "A 'quasi contract' only applies in the absence of an express agreement," and is "imposed in order to prevent a party's unjust enrichment."[48] In this case, there is not just one express agreement, but two—the alleged oral Team Tyson Agreement on which the complaint is based and the December 28, 1995 Agreement that superseded it. Furthermore, there is nothing in the complaint to suggest that, had these agreements not existed, it would be inequitable or unjust for King not to pay Horne the share of King's promotion earnings that Horne says is due him.

### G. Sixth Cause of Action: An Accounting

■ Horne himself points out that "[i]n order to sustain an equitable action for accounting under New York law, a plaintiff must show either a fiduciary or confidential relationship with the defendant."[49] As discussed above, the complaint fails to show such a relationship. Accordingly, the sixth cause of action will be dismissed.

### H. Leave to Amend

In his opposition brief, Horne indicates a desire to amend the complaint to allege that he was defrauded into signing the December 28, 1995 Agreement. But Horne's explanation of the fraud and of what he would plead makes no sense. Horne seems to contend that only a version dated December 27, 1995 properly was signed by all the parties and that Horne did not know what he signed on December 28 because he received only the signature page by facsimile.[50]

---

F.Supp.2d 255, 268 (S.D.N.Y.2004); *see also Northeast General Corp. v. Wellington Adver., Inc.*, 82 N.Y.2d 158, 162–65, 604 N.Y.S.2d 1, 3–5, 624 N.E.2d 129 (1993).

**46.** Cpt. ¶¶ 92–93.

**47.** Horne's brief also uses the term "quasi-contract." Horne Mem. 16–17.

**48.** *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190 (1987); *accord Nat'l Westminster Bank plc v. Grant Prideco, Inc.*,

261 F.Supp.2d 265, 275–76 (S.D.N.Y.2003); *ICC Indus., Inc. v. Sifavitor S.p.A.*, No. 96 Civ. 5757(LAK), 1997 WL 214969, at *5 (S.D.N.Y. Apr.28, 1997).

**49.** Horne Mem. 17. The language is lifted directly from *Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44, 49 (2d Cir.1996) (citing *Palazzo v. Palazzo*, 121 A.D.2d 261, 265, 503 N.Y.S.2d 381, 384 (1st Dep't 1986)), even though the brief fails to use quotation marks.

**50.** *See* Horne Mem. 6–7, 14–15.

But the document said to be the December 27 version would have given Horne *less*, not more. The material differences between the two versions are that the December 27 version omits (1) the conveyance to Tyson and the plaintiffs of shares of certain amounts due to King under the Showtime Agreement, and (2) Tyson's conveyance to King and the plaintiffs of portions of the prize money Tyson would receive under the Showtime Agreement.[51] If, as Horne implies, the minds truly met only over the terms of what is said to be the December 27 version—a version that contains the same integration clause as that in the December 28 version—then not only would Horne be no closer to a valid claim based on the alleged oral Team Tyson Agreement, but he presumably would have reaped benefits under the December 28, 1995 Agreement to which he was not in fact entitled.

Horne has not moved for leave to amend the complaint, but even if the relevant discussion in Horne's memorandum in opposition to this motion were construed as a motion for leave to amend, the motion would be denied in the exercise of discretion.

### Conclusion

The defendants' motion to dismiss [docket item 9] is granted. The Clerk shall enter final judgment accordingly and close the case.

SO ORDERED.

---

**51.** *See* Horne Aff. Ex. D.

The omitted clauses are those marked (i)(b) and (ii) in the second paragraph of the December 28, 1995 Agreement, as excerpted earlier in this opinion.